IDEAL ELECTRONIC SECURITY
CO., INC., et al., Appellants,

v.

Tyrone BROWN, et al., Appellees.

No. 00–CV–847.

District of Columbia Court of Appeals.

Argued Sept. 25, 2002.
Decided Feb. 27, 2003.

 

John W. Karr, with whom Theodore S. Allison was on the brief, Washington, DC, for appellants.

Lawrence E. Carr, III, with whom Timothy R. Feely was on the brief, Washington, DC, for appellees.

Before STEADMAN and RUIZ, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

Appellants, Ideal Electronic Security Co., Inc., Ideal Electrical Supply Corporation, Cora Williams and Kenneth Rogers, appeal the judgment entered against them on all counts by the Superior Court of the District of Columbia based on a jury's finding that appellants' negligence claims were barred by the statute of limitations. Appellants contend that (1) there was insufficient evidence to support the submission of the statute of limitations defense of appellees, Tyrone Brown and Brown & Company, to the jury or to support the jury's verdict, and (2) the trial court erroneously admitted a handwritten document into evidence over objection. We disagree and affirm.

## I.

In 1991 Ideal Electronic Security Co., Inc. (Ideal) was split into Ideal Electronic Security Co., Inc. (Security) and Ideal Electrical Supply Corporation (Supply). Appellants Williams and Rogers were officers of both companies. Prior to the split, appellee, Tyrone Brown, a certified public accountant and the sole proprietor of appellee Brown & Company, (collectively, Brown), had rendered general accounting services to Ideal including the preparation of financial statements and tax matters. From 1991 through 1993 Brown prepared Security's tax returns incorrectly with re-

spect to reporting unbilled receivables. During this same period, Supply used Louis Simmermacher, an accountant, other than Brown, to prepare its tax returns. Simmermacher, however, used the wrong accounting method in preparing Supply's return, that is, he used the cash accounting method instead of the accrual accounting method. Supply continued to use Brown to perform annual reviews of its financial statements. Brown disagreed with appellants that his annual reviews of Supply's financial statements required him to review the tax returns Simmermacher prepared and call any error to the attention of Supply.

In late 1994, IRS Agent Sandra Miller commenced an investigation of the pension plans of Security and Supply. The investigation widened to include Security's unbilled receivables. Agent Miller prepared a document, marked at trial as defense exhibit 25 (exhibit 25), dated March 2, 1995, that dealt with Security's unbilled receivables and calculated the back taxes, penalties, and interest that appellant Security owed the IRS due to its incorrect reporting of such receivables in its 1991 through 1994 tax returns.

On August 18, 1995, both Security and Supply terminated Brown, who was still performing some accounting services for Supply, not including the preparation of tax returns, and hired Keller Bruner & Company (Keller). Keller discovered in September 1995 that Supply's tax returns, prepared by Simmermacher, had errone-

ously used the cash accounting method. Keller testified that he continued using the same incorrect method in Supply's 1994 tax return because under IRS regulations a company, while under audit, cannot change its accounting method.[1] Nevertheless, Keller, as well as appellants Williams and Rogers, consciously decided not to bring the use of the wrong accounting method in past returns to the IRS's attention, gambling that the IRS would not spot the accounting error. Keller also started to review Security's past filings for the IRS audit. In mid-December 1995, Security and Supply received written requests from the IRS asking for their consent to extend the statute of limitations for its audit of their tax returns for 1992 through 1994.

Finally, on April 2, 1997, IRS Agent Lee Turowski, who had replaced Miller and another agent on the case, issued and signed written assessments according to which Security and Supply owed the IRS large sums in interest and penalties for their incorrect tax filings. All four appellants then filed their negligence claim against Brown on October 30, 1998. After trial, a jury found that appellants' claims were barred by the statute of limitations.

## II.

▮▮▮▮▮▮ With respect to Security's claims, the trial court did not err in submitting appellees' statute of limitations defense to the jury or in finding that there was enough evidence to support the jury's ver-

---

1. Testimony of Daniel Ward of Keller:
 Q. Why [could you not amend the return]?
 A. The IRS regulations say that I could not change the method of accounting while I am under audit.
 Q. Can you point me to some specific IRS regulation that overcomes this statement [that the return is true and complete] reflected on the cover page of the 1120 which you filed? ... Now, is there something in

the IRS Code or the regulation thereto that say that when you are in a situation such as you confronted, that it's okay to allow your client to perjure himself by saying that it's all accurate and filing it?
A. We were, I believe that the regulation that we were using was 92–75.
Now, whether that ties directly to this statement, I don't believe that we analyzed it quite that closely.

dict. There was ample evidence that Security was on inquiry notice before October 30, 1995 and, therefore, more than three years before it filed suit on October 30, 1998, that it had a negligence claim against appellee Brown. "[I]n cases where the relationship between the fact of injury and some tortious conduct is obscure at the time of injury, this court has applied the 'discovery rule' to determine when the statute of limitations begins to run." *See Knight v. Furlow,* 553 A.2d 1232, 1234 (D.C.1989) (citations omitted). Under the discovery rule, a cause of action accrues and the statute of limitations begins to run

> when the plaintiff knows or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing. Under this rule, the plaintiff does not have *carte blanche* to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm. Nor need all damages be sustained, or even identified, for the cause of action to accrue; any appreciable and actual harm flowing from the defendant's conduct is sufficient.

*Beard v. Edmondson and Gallagher,* 790 A.2d 541, 546 (D.C.2002) (internal citations and quotations omitted). *See also Diamond v. Davis,* 680 A.2d 364, 372 (D.C. 1996); *Knight, supra,* 553 A.2d at 1234.

■ The evidence supported a finding that Security failed to meet its duty to act reasonably under the circumstances in investigating matters affecting its affairs. On March 2, 1995, during her examination of Security's unbilled receivables, IRS Agent Miller spoke with appellee Brown, appellant Rogers, and Bill Storey, Security's in-house accountant, and requested work papers, an analysis of Security's unbilled receivables, and Security's total costs to total receivables ratio. Miller cre-

ated a document, exhibit 25, showing the correct assessment of Security's unbilled receivables, and setting both the amounts appellant would be charged in interest and penalties. Security argues that the calculations set forth in exhibit 25 did not indicate that Security would be facing tax liability in the future. These very same calculations, however, later appeared on IRS Agent Turowski's 1997 assessment of interest and penalties against the company for incorrectly reporting its unbilled receivables. The fact, known to Security, that the IRS was inquiring into Security's unbilled receivables in early 1995 to the extent of preparing specific tax calculations is strong indication that Security should have investigated whether something may have been amiss regarding the reporting of Security's unbilled receivables in its past tax returns prepared by Brown.

Appellants terminated Brown in August 1995. At trial, Cora Williams, the coowner and President of Security and Supply, stated that Brown was not commissioned to work on the tax audit because it would have been like giving "matches to someone that just burned down our house," implying that she knew by August 1995, that Brown had made mistakes that harmed the two companies. In September 1995, Keller, the accountant who was hired in late spring or early summer of 1995 to replace Brown, discovered that Brown had failed to notice in his review of Supply's tax filings that accountant Simmermacher had used an incorrect accounting method. Knowing that Brown had failed to notice that Supply's tax returns were incorrect, Security, Williams and Rogers, in order to exercise due diligence, could reasonably have been expected to cause Keller (or another accountant) to review the Security tax returns prepared by Brown as well for mistakes such as the unbilled receivables before October 30, 1995.

Evidence also existed from which the jury could find that before the end of October 1995 Security was on actual notice, in addition to inquiry notice, that Brown had incorrectly reported Security's unbilled receivables. Williams testified that originally Keller was not hired to work on Security's audit. On October 10, 1995, however, Keller invoiced Security for its September work on the "IRS examination." Keller's October bill to Security was succeeded by a bill dated November 10 for an October meeting and gathering of information related to the IRS audit of 1991 through 1994. These billings establish that appellant Security had ample reason to know it had been injured by appellee's negligence and suffered damages before October 30, 1995, and thus more than three years before suit was filed on October 30, 1998.

Keller's work commenced several months after IRS Agent Miller's March 2, 1995 memorandum, which set forth Security's liability for unbilled receivables. In addition, defense exhibit 41, a document penned by Daniel Ward of Keller, contains minutes from a meeting with Storey, Rogers, and Brown, among others, that establish that Keller possessed Agent Miller's March 1995 memorandum setting forth adjustments to Security's past tax returns and knew that the IRS had zeroed in on Security for incorrectly reporting its unbilled receivables. Although the document is dated with a month and a day, September 18, but not a year, Ward acknowledged that the meeting possibly took place in September 1995. The year 1995 is consistent with Keller's billing and the chronology of its involvement in Security's tax matters. Since there was evidence supporting a finding that appellant Security had actual notice in September and early October 1995 of its failure to make the required reporting of receivables, the trial court did not err in submitting appellees' statute of limitations defense to the jury or in finding that there was sufficient evidence to support the jury's verdict against Security.

## III.

■ The record also contains sufficient evidence to support the jury's finding that Supply, too, had actual notice before October 30, 1995, that it had suffered an injury from appellee's negligence in that it needed to hire an accountant to refile corrected returns and was aware that it was legally obligated to pay the government back taxes, penalties and interest. *See United States v. Kerner,* 895 F.2d 1159, 1161–62 (7th Cir.1990) (financial injury includes back taxes, penalties and interest); *United States v. Keane,* 852 F.2d 199, 204 (7th Cir.1988) (financial injury gives appellant a "stake sufficient to produce a 'case or controversy'"). Specifically, in September 1995, Keller informed Supply that appellee Brown, who according to Supply was responsible for reviewing its 1991 through 1993 tax returns prepared by Simmermacher, had failed to notice that Simmermacher had used an incorrect accounting method. At that time Supply became aware that it had sustained an injury at least to the extent that it recognized the need to authorize Keller (or another accountant) to do work in addition to the work that Keller was originally hired to perform, such as refiling its past tax returns, determining how the 1994 return should be filed since past returns were filed incorrectly, and conducting a meeting concerning the use of the wrong accounting method.

■ In addition, Supply also became aware by September 1995 that it was legally obligated to pay back taxes, interest and penalties to the IRS and, in that regard, was further injured by appellee's alleged negligence. Although the extent

of Supply's injury could not be calculated until Supply was fined by the IRS in 1997, a claim for legal malpractice accrues when the plaintiff has sustained some injury, even if the injury occurs prior to the time at which the precise amount of damages can be ascertained. *See Knight, supra*, 553 A.2d at 1234, 1236 (citations omitted). Therefore, we are not convinced by Supply's argument that it sustained no injury until the IRS actually calculated the amount of back taxes, penalties and interest, and that therefore Supply acted within the three-year statute of limitation when it filed its claim against appellee Brown in October 1998.

Finally, the conscious decision by Keller and Supply not to bring the use of the wrong accounting method in past returns to the IRS's attention only deferred the IRS's assessment of fines, thereby purposefully delaying its ascertainment of its total damages.[2] This conscious decision by Supply to gamble that the IRS would not immediately spot the error, in the hope of spreading the impact of the tax liabilities over several years, also establishes that Supply recognized it was injured.[3] Even though damages in the form of interest and penalties from the IRS were not actually assessed until 1997, we are satisfied that sufficient evidence existed to support the trial court's submission of Brown's statute of limitations defense to the jury, as well as to support the jury's verdict that Supply filed its negligence claim after the statute of limitations had run.

## IV.

■ Appellants argue that the trial court erred in admitting exhibit 25 over

---

2. Testimony of Daniel Ward of Keller Bruner:

Q. And you hit upon the strategy of continuing with this and why?
A. Because we were under audit
We could not change the accounting method and we were early in the stages of an IRS audit, at least, as far as Keller Bruner was concerned and I was not going to telegraph the situation to them.
There was a possibility that they could have missed it.
Q. What do you mean when you say that you were not going to telegraph the IRS that this was a problem?
I didn't want to put an issue on the table for them to expand on.

3. Testimony of Daniel Ward of Keller Bruner:

Q. I don't understand. Explain to the jury if you would why you did not just go to the IRS and say Ms. Turowski or Ms. Miller, at the time, whomever, we have this problem where we have realized that we made a mistake. Our client made a mistake.
I don't want to file a false tax return. I want to straighten out the old ones. Why didn't you do that?
A. Because if the IRS had missed this and there is a possibility that they could have missed it, we could have that changed, ex-cuse me, changed the accounting method and received a favorable spread, forward spread of, I believe, that its's three or four years.
I don't recall exactly.
So, we would have been able to take the catch up adjustment and spread that forward helping our client so that they would not have been hit with all of this tax at one year.

. . . . .

A. We would have gotten a favorable spread if we had not—if they had not picked up on this.
Q. I don't understand a favorable spread. Is that a point spread? What are you talking about?
A. There was a catch up. There is a certain amount of income that you change, that you would have had to recognize.
If they missed this, we would have been able to calculate the income and spread it, pick up, I think that it is one fourth over the next four years instead of saying okay, you have 500,000 dollars catch up adjustment, pay the tax on the 500 and we would have taken 125 and picked that up over the next four years.
Q. You could have softened the blow basically?
A. Yes.

their hearsay objection. In order to preserve the right to appeal, however, appellants were required to make specific objections. Because the objections that appellants now refer to as hearsay objections were vague and non-specific, appellants did not reserve the right to appeal on the ground that defense exhibit 25 was improperly admitted hearsay.[4]

 Assuming *arguendo* that appellants made an adequate hearsay objection, the trial court would not have erred by admitting exhibit 25 over that objection. Appellees did not offer exhibit 25 as evidence that Security incorrectly reported its unbilled receivables, which would be hearsay, but rather to establish that because Security knew the IRS was investigating the matter of unbilled receivables, Security had been put on inquiry notice that Security's past tax reportings may have been incorrect. Appellee Brown offered the document through Agent Turowski who testified that in her 1997 assessment she relied on Agent Miller's March 1995 calculation of tax liability. Brown thus presented exhibit 25 for the purpose of showing that, in light of Storey's and Rogers' interactions with Agent Miller in her production of the March 2, 1995, document setting forth the calculations of Security's unpaid tax liability and Keller's awareness in September 1995 of the March 2, 1995, document, the problem with the unbilled receivables was made known to Security before October 30, 1995.[5]

4. Mr. Karr (Appellant's Counsel): We do have an objection to 25, I think we talked about that. I mentioned it. Well, it has not been authenticated. I mean, you know, I have no idea if this IRS agent wrote this. I mean, it's certainly— excuse me. Certainly the Keller Bruner people when they are on the witness stand can be asked where they got it. If they got it from IRS and if they say this is a document that an IRS agent wrote, even though it would still be hearsay of the sort, I have no objection to it but this is— I have no idea— who the author of that is. If it's important, this witness, I'm sure has never seen it.

 Mr. Karr: All they have to do is issue a subpoena this afternoon after you break, serve it on Sandra Miller, put her on the witness stand in their case and say what is this document. Now, he's going to try to do it again through this witness who did not prepare this document whose conclusions are not on this document and whose thoughts and, you know, participation is— are not on this document. They're going to try to prove somebody else's document through this witness. All they have to do is issue a subpoena. That's all. She'll be here Monday morning.
 The Court: Yes
 Mr. Carr (Appellee's Counsel): Your honor, she has said that she based that document largely on the work papers of Sandra Mil-

ler. If she says she doesn't recognize it and this is not what she based it upon -
The Court: But if she says she recognized it then, this document, then I think it's based -
Mr. Karr: If she—but that has to be the question, right?
The Court: All right. ·
Mr. Karr: Okay. As long as that's the question, that's fine.

 · · · · ·
Mr. Karr: Well, if it's in evidence, you know, we can publish it. I mean, our objection, you know our objection.
The Court: Sure
Mr. Karr: That is that it contains opinions, and so forth, that can easily be cross-examined or can be examined if she's here. In fact, could we make that determination in support of the—in support of the objection, would you permit me to ask this witness if Ms. Miller still works for the IRS?
The Court: Sure
Mr. Karr: Does Ms. Miller still work for the IRS?
The Witness: Yes she does.
Mr. Karr: Okay.

5. Appellee also argues that exhibit 25 was admissible under the public records exception to the hearsay rule. *See Goldsberry v. United States*, 598 A.2d 376, 378 (D.C.1991) ("[a]ll documents prepared by public officials pursu-

Finally, appellants assert that the trial court erred in allowing Agent Turowski to authenticate exhibit 25, because the document had been completed by Agent Miller. We cannot agree. Both sides waived authentication of exhibit 25 in the pretrial conference, as reflected in the pretrial order.[6]

Accordingly, the judgment of the trial court is affirmed.

*So ordered.*

ant to a duty imposed by law or required by the nature of their offices are admissible as proof of the facts stated therein."); *see also United States v. Puente,* 826 F.2d 1415 (5th Cir.1987) ("the duty requirement [of the public record exception] is satisfied if the record is reasonably necessary for the efficient administration of the office"). While appellee

makes substantial arguments for that position, we need not reach it in this case.

6. As we affirm the judgment of the trial court on the merits, we do not address appellees' argument that appellants failed to preserve their right to appeal on the basis of the insufficiency of the evidence.