Junior Larry HILLBROOM,
et al., Appellants,

v.

PRICEWATERHOUSECOOPERS
LLP, et al., Appellees.

No. 10–CV–92.

District of Columbia Court of Appeals.

Argued Dec. 2, 2010.
Decided April 7, 2011.

Shannon L. Clark, with whom Patrick
M. Regan, Washington, D.C., Patrick J.

McGroder, C. Lincoln Combs, and Kenneth von Schaumburg, Washington, D.C., were on the brief, for appellants.

Erin Morrow Hawley, with whom Diana L. Weiss and Jeffrey S. Bucholtz, Washington, D.C., were on the brief, for appellee PricewaterhouseCoopers LLP.

Gregory F. Jenner, pro se.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and STEADMAN, Senior Judge.

THOMPSON, Associate Judge:

This appeal arises out of the dismissal of a lawsuit against defendants/appellees, Gregory Jenner (a tax attorney) and PricewaterhouseCoopers LLP ("PwC") (the accounting firm with which Jenner was associated), for professional negligence, breach of contract, and breach of fiduciary duty, in connection with Jenner's alleged failure to timely file formal claims for refunds of a portion of the federal estate taxes paid by the estate of Larry Hillblom ("the Estate").[1] Plaintiffs/appellants are several individuals who had an interest in the refunds: Hillblom's heirs, their respective guardians ad litem and trustees, and an escrow agent (the "Escrow Agent") who is the legal successor in interest to the Estate.[2] The trial court granted defendants'/appellees' motion to dismiss the suit under Super. Ct. Civ. R. 12(b)(6), as barred by the statute of limitations. On appeal, appellants contend (1) that the trial court erred in its determination as to when their cause of action accrued, and (2) that, in any event, the running of the limitations period is tolled with regard to the plaintiffs/appellants who are minors (to wit, heirs J.C., N.B.L., and M.F.). Because we conclude that resolution of these issues must await a fuller development of the record, we reverse and remand for further proceedings.

## I. Background

The Amended Complaint (the "Complaint"), appellants' opposition to the motion to dismiss, and their briefs on appeal present the following picture.[3] In

---

1. Hillblom was a co-founder of the international express delivery business DHL.

2. Specifically, plaintiffs' Complaint states that the plaintiffs/appellants are Junior Larry Hillbroom, the sole beneficiary of the J.L.H. Trust; Keith Waibel, trustee of the J.L.H. Trust; David Moncrieff, legal guardian of J.C. and representative of the J.C. Trust; J. Steven Grist, legal guardian of N.B.L. and representative of the Be Lory Trust; Ma Mercedes P. Feliciano, legal guardian of M.F. and representative of the M.F. Trust; and Peter Scardello, the Escrow Agent. The Complaint avers that Moncrieff, Grist, and Feliciano "represent[ ]" the respective trusts; appellants' counsel clarified at oral argument that this denotes that these individuals are trustees of the named trusts. Each of the individuals identified in ¶¶ 1–5 of the Complaint as a "legal guardian" is identified in the caption of the Complaint as a "guardian ad litem."

3. The exhibits that appellants attached to their opposition to the motion to dismiss and the factual assertions in appellants' various briefs are not, of course, evidence, and we do not take them as proven. But "a plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment." *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir.1992); *see also Pegram v. Herdrich*, 530 U.S. 211, 230 n. 10, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) ("Though this case involves a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and the complaint should therefore be construed generously, we may use Herdrich's brief to clarify allegations in her complaint whose meaning is unclear."); *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 428 n. 8 (3d Cir.1999) ("The brief is not evidence, but it

May 1995, Hillblom, a resident of Saipan in the Commonwealth of the Northern Mariana Islands ("CNMI"), died in an airplane crash, leaving the Estate worth approximately $353 million. Hillblom's will, which directed that the bulk of the Estate be given to charity through the creation of a charitable trust, was admitted to probate in the Superior Court of the CNMI on July 17, 1995. Subsequently, several claimants filed petitions seeking a share of the Estate as Hillblom's pretermitted heirs. These heir claimants—Hillbroom, J.C., N.B.L., and M.F.—were established as Hillblom's biological children, after which each became known as a Qualified Heir Claimant ("QHC"). On April 6, 2000, after extensive litigation, the Estate, the charitable trust, the guardian ad litem and a trustee for Hillbroom, and guardians ad litem for J.C., N.B.L. and M.F. entered into a Global Settlement Agreement ("GSA") that divided the Estate between the QHCs and the charitable trust, with the former receiving 60% and the latter receiving 40%. Under the GSA and an April 7, 2000 court order incorporating it, the Escrow Agent was named the legal successor to the Estate's interest in any refunds of estate tax paid by the Estate, and the Escrow Agent was to pursue refunds and receive and hold any recovered amounts for the benefit of the QHCs. A Tax Refund and Escrow Agreement (the "Escrow Agreement") between and among the Escrow Agent and the QHCs and their guardians ad litem and trustees, made effective as of April 6, 2000, also described the Escrow Agent's responsibility to pursue the tax refunds. Execution of the GSA and the Escrow Agreement and issuance of the April 7, 2000 order enabled the Superior Court of the CNMI to close the Estate.

Meanwhile, in June 1999, while the probate litigation was still underway, the Estate's Executor had reported to the IRS an estate tax deficiency in the amount of $43,348,728, and, on July 12, 1999, the Executor paid the deficiency to the IRS. On December 7, 1999, however, the Executor reported a corrected net estate tax amount of $37,655,193, resulting in a federal estate tax overpayment of $5,729,113. According to appellants' brief on appeal, the adjustment reflected "the Estate's ad-

allows us to interpret the complaint."); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993) (stating that, in considering motions to dismiss, "[o]rdinarily, ... any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden," but acknowledging that "courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties," "for documents central to plaintiffs' claim," and "for documents sufficiently referred to in the complaint"); *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 915 (7th Cir.1985) (explaining that the appellant "was free on this appeal to give us an unsubstantiated version of the events ... provided it was not inconsistent with the allegations of the complaint ... in order to show that the complaint should not have been dismissed on its face"); *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir.2010) ("[N]othing in [*Ashcroft v.*] *Iqbal* [—— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ] or [*Bell Atlantic Corp. v.*] *Twombly* [550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ] precludes the plaintiff from later suggesting to the court a set of facts, consistent with the well-pleaded complaint, that shows that the complaint should not be dismissed."); *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C.Cir.1996) ("A dismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.") (citations, emphasis, and internal quotation marks omitted). The additional factual assertions that we consider here do not conflict with the allegations of the Complaint. *See Goldman v. Summerfield*, 214 F.2d 858, 859 (D.C.Cir. 1954) (condemning "the use of legal memoranda as a 'vehicle of factual conflict' ") (citation omitted).

ministrative expenses [having] increas[ed] well beyond estimated figures due to the dispute with the QHCs." Accompanying the December 1999 revised estate tax return was a legal memorandum to the IRS (the "Refund Claim Memorandum"), prepared by the Executor's tax counsel, that "set forth in detail the grounds upon which the refund claim was based." According to the Complaint, the Refund Claim Memorandum "claimed a refund for the $5,729,113 overpayment of federal estate taxes." Appellants assert that "[a]ll that was needed was for a diligent tax professional to deliver the final refund application paperwork to the IRS."

The Escrow Agreement directed the Escrow Agent to retain Jenner and PwC, who had served as tax advisors to the QHCs since 1998 to pursue the refund claims. The Complaint avers that in early May 2000, lawyers who had served as tax counsel to the Estate met with appellee Jenner and advised him of the "possibility of additional [estate tax] refunds in light of the increased administrative expenses" and "instructed Defendant Jenner to pursue a claim for refund as a result of the additional estate administrative expenses." Thereafter, "numerous additional administrative expenses and death taxes were incurred by the Estate which increased the amount of potential refund available to the QHCs."

In a May 22, 2000 email from appellee Jenner to counsel for the QHCs (filed in the trial court as an exhibit to appellants' opposition to the motion to dismiss), appellee Jenner referred to the "first claim for refund (already filed)" and stated that "there is little that needs to be done at this point," that "Blumenfeld has made his determination granting the claim in its entirety, which must now be reviewed by the Joint Committee."[4] Jenner advised that "[t]he refund procedure will run its course in due time and there is very little that can or should be done to expedite it." As to the "additional claims for refund," Jenner advised that "tactically it probably makes sense to wait" for IRS approval of the first refund claim (presumably, the one claimed through the Refund Claim Memorandum) "before filing additional claims," and explained that "subject to any time limitations, which I will check on," to avoid a "higher level of scrutiny," "it would be better to 'bank' the first [claim] before filing any additional claims." The pleadings do not explain when (or whether) the "first refund claim" was paid.[5]

The Complaint states that, under Internal Revenue Code § 6511(a), "the last day for [appellees] to file a claim for an estate tax refund [based on deductible administrative expenses] would have been ... July 12, 2001,"[6] and, under other IRC provisions, "the last day for [appellees] to file a claim for ... refunds [related to

---

4. Presumably, the congressional Joint Committee on Taxation. The Internal Revenue Code provides that "[n]o refund or credit of any ... estate ... tax ... in excess of $2,000,000 shall be made until after the expiration of 30 days from the date upon which a report giving the name of the person to whom the refund or credit is to be made, the amount of such refund or credit, and a summary of the facts and the decision of the Secretary, is submitted to the Joint Committee on Taxation." 26 U.S.C. § 6405(a) (2001).

5. As appellees stated in their brief in support of their motion to dismiss, the Complaint does not make clear how the refund amount described in the Complaint "relates, if at all, to the refund claimed in the Refund Claim Memorandum."

6. The Internal Revenue Code provides that the statute of limitations for tax refund claims is the later of "3 years from the time the return was filed or 2 years from the time the tax was paid." 26 U.S.C. § 6511(a) (2001).

foreign or state death tax credits] would have been August 20, 2000." However, the Complaint avers, "[n]o action was ever taken by [appellees] to pursue any refund claims" and appellees "never investigated or otherwise pursued" any refund claims. Appellants assert that appellees "never actually delivered the formal refund claim paperwork to the IRS."

On December 10, 2002, the Escrow Agent and the QHCs engaged new legal counsel to pursue "any and all claims for tax refunds to which the Estate may have been entitled on behalf of the QHCs." The Complaint states that although "the applicable statutes of limitations for the QHCs' claims had already expired by the time new counsel was retained," the new attorneys pursued refunds "under the theory that the Estate, although having failed to file a timely refund claim, had filed a protective claim for refund by submitting the Refund Claim Memorandum to the IRS." According to appellants' opposition to the motion to dismiss, "[b]ased on the QHCs' position that an informal refund claim had been filed, the IRS paid in full the refund associated with the Estate's payment of foreign death tax credits." This transpired even though, according to the Complaint, at least some of the death tax credits had been identified "after May 8, 2000" (i.e., well after the Refund Claim Memorandum was submitted in 1999), and even though appellees "never investigated or otherwise pursued refund claims for these amounts either" before the statutory deadline. With respect to other portions of the refund that the QHCs sought, however, "[t]he IRS disputed [the] interpretation" that the amounts were allowable on the basis of the 1999 protective claim. The Complaint avers that "due to the uncertain nature of the law governing protective refund claims," appellants "faced the real possibility of not receiving a refund at all if the refund claims were litigated." "To resolve the dispute over the refunds without litigation," appellants agreed to settle with the IRS, and to accept a refund of $4,502,851, plus accrued interest. The settlement was approved by the Joint Committee on Taxation on December 17, 2007, and was executed on December 27, 2007.

■ On June 22, 2009, appellants filed the instant lawsuit. The Complaint alleges that appellees negligently "fail[ed] to file the refund claims on [appellants'] behalf before the expiration of the applicable statutes of limitation[s]."[7] If Jenner had timely filed the refund claim, appellants assert, they would have been entitled to over $10 million plus interest, instead of the approximately $4.5 million plus interest that they received from the IRS. The Amended Complaint sought damages of approximately $6.37 million, plus interest and consequential damages.

On October 13, 2009, appellees filed their motion to dismiss, arguing that appellants' claim was barred by the three-year statute of limitations delineated in D.C.Code § 12–301 (2001). Appellees asserted that the three-year limitations period began to run at the very latest by December 10, 2002 (when appellants re-

---

7. In addition to asserting a claim of professional negligence, appellants alleged that appellees' omissions constituted a breach of contract and breach of fiduciary duty. Appellants scarcely discuss those claims in their briefs on appeal, but represented at oral argument that they have not abandoned them. In any event, as discussed *infra*, these claims are subject to the same (three-year) limitations period as applies to the professional negligence claim. Moreover, "in professional malpractice cases, alleged negligence and breach of contract are typically premised on the same duty of care and, as a consequence, should typically lead to the same legal result." *Asuncion v. Columbia Hosp. for Women,* 514 A.2d 1187, 1191 (D.C.1986).

tained new counsel and admittedly were aware that appellees had missed the tax refund filing deadlines), and therefore expired years before appellants filed their Complaint. Opposing the motion to dismiss, appellants argued that while they became aware of appellees' omissions and inaction more than three years prior to filing their lawsuit claim, the lawsuit was timely filed because they did not suffer an "actual injury," and the limitations period did not begin to run, until they settled their refund claims with the IRS in December 2007. Appellants also argued that regardless of the trial court's determination as to that issue, D.C.Code § 12–302 tolled the limitations with respect to the three minor QHCs.[8]

On December 22, 2009, the trial court granted appellees' motion to dismiss, agreeing with Jenner and PwC that since appellants did not file suit until June 22, 2009, their claims were barred by the three-year statute of limitations. The court reasoned that appellants' injury occurred by December 10, 2002, when they hired new counsel and "were aware that [appellees] had allowed the deadlines to lapse without taking action" and knew that appellees "missed the deadline to recover overpaid taxes." The court reasoned further that appellants suffered a separate injury at the same time when they "retain[ed] new counsel and incur[red] additional litigation expenses." In addition, the court rejected appellants' argument that the running of the limitations period was tolled for the minor QHCs, citing the principle that "a beneficiary [of a trust]

cannot bring an action directly against a third-party wrongdoer ... rather, his relief is an action in equity against the trustee to compel the trustee to proceed against the third-party." [9] The court reasoned that while the QHCs might have a right of action against the Escrow Agent to compel the Escrow Agent to proceed against third-party wrongdoers, the QHCs could not bring an action directly against appellees as alleged wrongdoers. This appeal followed.

## II. Standard of Review

We review an order granting a motion to dismiss de novo. *Chamberlain v. American Honda Fin. Corp.*, 931 A.2d 1018, 1022 (D.C.2007). In so doing, we apply the same standard the trial court was required to apply, accepting the allegations in the complaint as true and viewing all facts and drawing all reasonable inferences in favor of the plaintiffs. *Murray v. Wells Fargo Home Mort.*, 953 A.2d 308, 316 (D.C.2008). "Any uncertainties or ambiguities" in the complaint "must be resolved in favor of the pleader." *Atkins v. Industrial Telecommunications Ass'n*, 660 A.2d 885, 887 (D.C.1995).

## III. Applicable Law and Analysis

A claim for professional malpractice may not be brought more than three years after the right to maintain the cause of action accrues. *See* D.C.Code § 12–301(8) (2001); *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 994 (D.C. 1978). In general, "this means the time when the plaintiff suffers injury." [10] *Id.*

---

8. D.C.Code § 12–302(a) (2001) states that "when a person entitled to maintain an action is, at the time the right of action accrues ... under 18 years of age ... he or his proper representative may bring action within the time limited after the disability is removed."

9. *Robinson v. Samuel C. Boyd & Son, Inc.*, 822 A.2d 1093, 1103 (D.C.2003).

10. The term "injury" encompasses "any ... impairment of a right, remedy or interest ..." *Bleck v. Power*, 955 A.2d 712, 715 (D.C.2008) (quoting 3 Mallen & Smith, Legal Malpractice,

But "a plaintiff need not be aware of the full extent of her injuries for her cause of action to accrue." *Morton v. National Med. Enters.*, 725 A.2d 462, 469 (D.C. 1999); *see also Colbert v. Georgetown Univ.*, 641 A.2d 469, 473 (D.C.1994) (en banc) ("[A] plaintiff who has information regarding a defendant's negligence, and who knows that she has been significantly injured, [may not] defer institution of suit and wait and see whether additional injuries come to light."); *Ideal Elec. Sec. Co. v. Brown*, 817 A.2d 806, 811 (D.C.2003) ("[A] claim for legal malpractice accrues when the plaintiff has sustained some injury, even if the injury occurs prior to the time at which the precise amount of damages can be ascertained."). Our cases make clear, however, that "[t]he mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence." *Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C.1989) (collecting cases). In addition, for professional malpractice cases, this court has adopted the "continuous representation rule," under which a malpractice claim "will not accrue until the representation is terminated, even though the client's knowledge might otherwise have triggered the statute earlier." *Wagner v. Sellinger*, 847 A.2d 1151, 1155 (D.C.2004) (citing *R.D.H. Commc'ns v. Winston*, 700 A.2d 766, 768 (D.C.1997)); *see also Bleck*, 955 A.2d at 715 (establishing that a claim does not accrue before termination "even if the client knows before then that her attorney has made an injurious error").

As already described, the trial court concluded that appellants' cause of action accrued by December 10, 2002, at the latest, when they were aware that appellees had allowed the tax-refund-claim deadlines to pass without "deliver[ing] the formal re-

fund claim paperwork to the IRS," and retained new counsel to pursue the tax refunds. Appellants contend that the trial court's conclusion was in error because they "had no injury or damages whatsoever ... until they settled their tax refund dispute with the IRS [in December 2007] for less than they were otherwise entitled because of the Accountants' negligence." Until that time, appellants argue, they "believed their refund claim was still fully valid and they still expected to receive the full amount to which the Estate was entitled." Appellants likewise take issue with the trial court's reasoning that by December 10, 2002, appellants suffered a separate injury when they began to incur the new lawyers' fees. Appellants contend that the court's reasoning "assumes facts not in the record in violation of the applicable standard of review for motions to dismiss."

Although on this record we are not persuaded by appellants' arguments about precisely when their cause of action accrued, we agree that the dismissal was at least premature.

## A. When Appellants Knew or Should Have Known That They Were Injured

■ Appellants contend that the issue of when their cause of action accrued is controlled by this court's decision in *Wagner*, 847 A.2d at 1151. *Wagner* was a legal malpractice action brought in August 1997 by clients who alleged that their previous attorneys mishandled their medical malpractice lawsuit by conducting inadequate discovery. *Id.* at 1153. The clients' complaint averred that the clients were "so disappointed and disgusted with" the previous attorneys' efforts that the clients terminated the representation (in July 1994).

§ 23:11, at 354 (2008 ed.) (internal quotations omitted)).

*Id.* at 1154. This court rejected the defendant attorneys' claim that the clients' cause of action for legal malpractice accrued at that time and that the malpractice suit brought more than three years later was time-barred. We reasoned that, before the conclusion of the medical malpractice trial, "there was no way to articulate any injury [from the lawyer's poor performance] that could yield ascertainable damages," and that "until the lawsuit [was] resolved (either by verdict or ruling in court or by settlement)," any injury "remain[ed] uncertain or inchoate." *Id.* at 1156.[11] We observed that in that circumstance, "even the strongest belief that the defendant has caused the plaintiff real harm will not transmute that belief into a reality for limitations purposes." *Id.* at 1155. We held that because the clients' only "demonstrable injury" occurred when the jury found (in August 1996) that the medical malpractice defendants were not liable, the clients' legal malpractice cause of action did not accrue before that time. *Id.* at 1157.

As we later explained in *Bleck*, the holding in *Wagner* "turned on the peculiar difficulty of determining whether an attorney's inferior representation *in the conduct of litigation* is injurious before the outcome of the litigation is known." *Bleck*, 955 A.2d at 717 (emphasis in original). Appellants liken the facts of this case to those of *Wagner*. They contend that the work related to the estate tax refund claims—transferred to appellees in 2000 and to new tax counsel in 2002—was the continuation of an ongoing legal proceeding and dispute with the IRS over the scope of the Estate's tax liability, and they argue that whether appellees' omissions were injurious could not be known until the entire matter was resolved. Thus, appellants argue, even though they earlier had " 'the strongest belief' that [appellees] *might* have caused them harm," they were not injured until they compromised and settled their claim in December 2007.

The analogy to *Wagner* is imperfect, but we are persuaded, on the basis of the factual allegations recited above, that this case resembles *Wagner* more so than it does *Weisberg* and *Bleck*, the cases that appellees urge should control the outcome here (or at least that this case falls somewhere in the middle, such that none of those precedents is entirely on point). Appellees argue that *Weisberg* and *Bleck* establish that missing a filing deadline "immediately impairs the underlying claim." We agree with the observation by our sister court, however, that our case law "clearly contemplates a flexible, case-by-case approach."[12] In this case, such a flexible approach requires us to take into account that the statutory deadlines for filing formal claims for federal estate tax refunds described in the Complaint are subject to various exceptions that have no counterparts under the statute of limitations that was involved in *Weisberg*, or the insurance contract that was involved in

---

11. We cited MALLEN & SMITH, LEGAL MALPRACTICE, § 22.11, at 380 (5th ed.2000), for the principle that an attorney's negligent error in the handling of a lawsuit "may create only the potential for injury.... If that potential is not realized until later—if its occurrence depends on a contingent or future event—then the injury is not sustained until the contingent or future event occurs." *Wagner*, 847 A.2d at 1156 (citations and internal quotation marks omitted). We observed that the Wagners' recognition, in an affidavit they prepared, of the "inadequacy of legal representation" did not "necessarily reflect actual, rather than potential, injury." *Id.*

12. *Williams v. Mordkofsky*, 901 F.2d 158, 162 (D.C.Cir.1990) (citing *Knight*, 553 A.2d at 1236).

*Bleck.*[13]

■ Appellants' factual allegations, summarized above, describe Estate counsel's use of an informal refund claim, rather than formal refund paperwork, and the QHCs' reliance on the efficacy of a protective refund claim. Without delving too far into the intricacies of federal tax law (and without purporting to resolve whether the principles we cite are applicable to the facts of this case), we note that "[i]nformal refund claims have long been held valid," *American Radiator & Standard Sanitary Corp. v. United States,* 318 F.2d 915, 920 (Ct.Cl.1963) (citing *United States v. Kales,* 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132

(1941)), and that some courts "[o]rdinarily ... advise taxpayers to file a conditional or protective refund claim ... to avoid potential statute of limitations problems." *United States v. Commercial Nat'l Bank,* 874 F.2d 1165, 1170 (7th Cir.1989).[14] As one court has explained, the adequacy of a written, informal refund claim "must be determined in light of the particular facts and circumstances of the case at issue," and "any gaps or ambiguities in the ... informal claim [may be] cured when a formal claim [is] filed, even though it was filed after the running of the statute of limitations." *New England Elec. Sys. v. United States,* 32 Fed.Cl. 636, 644, 647 (1995).[15] As another court explained, a

13. In *Weisberg,* 390 A.2d at 992, clients sued their former lawyers for malpractice for failing to promptly file a lawsuit under the Federal Tort Claims Act ("FTCA"), "thereby allowing the statute of limitations to run on the major part of appellants' claims under the Act and making it impossible to recover the amount of damages to which appellants considered themselves entitled." 390 A.2d at 994. We held that the clients' cause of action accrued, at the latest, "once they had obtained new counsel in the FTCA case and were on notice of the government's assertion of a statute of limitations defense to their FTCA claims." *Bleck,* 955 A.2d at 716. We specifically rejected the argument that the clients' cause of action accrued only when they finally settled their case against the government for "less than they would have absent [the lawyers'] alleged negligence in handling their case." *Weisberg,* 390 A.2d at 995.

In *Bleck,* the client retained a lawyer to represent her in challenging her insurance company's denial of her 1997 claim for disability benefits. The lawyer did not file suit against the insurer until 2002, and the insurer moved successfully to dismiss the suit as time-barred by a policy provision specifying that any action to recover benefits had to be brought within a two-year window. In 2007, having discharged that lawyer and hired new counsel, the client brought a legal malpractice action against the first lawyer. We reasoned that the suit was time-barred because the client was injured when the lawyer "missed the contractual deadline for commencing an

action against [the insurer], thereby forfeiting her claim for ... benefits." 955 A.2d at 715.

14. *See also, e.g., Cooper v. United States,* No. 3:97CV502–V, 2000 WL 1141598, at *6 n. 5, 2000 U.S. Dist. LEXIS 8988, at *20 n. 5 (W.D.N.C.2000) ("A general notice advising the government that the taxpayer believes his taxes have been erroneously assessed, requesting a refund and indicating that the basis of the refund is in litigation, is sufficient to constitute an 'informal' refund claim which may be perfected by the filing of a formal refund claim after the refund claim limitations has expired."); *Malcolm v. United States,* No. C–91–3204–SBA, 1992 WL 109079, at *3 n. 2, 1992 U.S. Dist. LEXIS 2723, at *8 n. 2 (N.D.Cal.1992) (("Generally, when the amount of a deductible expense cannot be determined within the time frame for filing refund claims, the proper procedure is to file a conditional claim before the statute of limitations runs.... By doing so, a claimant preserves his or her right to later pursue recovery of the improperly assessed taxes and avoid potential statute of limitations problems.") (citations and internal quotation marks omitted)).

15. *See also BCS Fin. Corp. v. United States,* 930 F.Supp. 1273, 1277 (N.D.Ill.1996) (noting that under certain circumstances "a timely 'informal' refund claim may serve to toll the statute of limitations until the taxpayers properly can file a formal refund request," and that "courts hold that they must determine

protective refund claim may preserve the taxpayer's rights with respect to claims based on additional expenses of a type mentioned in a supporting statement, even though the additional expenses are reported after the expiration of the limitations period. *First Nat'l Bank v. United States,* 280 F.2d 818, 820–21 (Ct.Cl.1960) (recounting that where an "original claim for refund, which was filed within the 3–year period of limitation," showed that the claim was "based upon the deduction from the decedent's gross estate of expenses, then indefinite as to amount, that would be payable in winding up certain specified business transactions" and declared that "when the correct amount of the foregoing items has been ascertained, claimant [would] notify" the IRS, and where such additional notice was filed after the expiration of the 3–year period of limitation, the

IRS allowed the additional deductions in computing the refund due to the taxpayer, accepting the notice as an amendment clarifying the original claim).

In light of the foregoing authorities and the facts as alleged, without a fuller development of the record, we are unable to agree with appellees and the trial court that appellants knew of their injury at the time Jenner and PwC let the August 20, 2000 and July 12, 2001 filing deadlines pass without filing formal refund claims. Without reviewing the Refund Claim Memorandum—a copy of which is not included in the record—and without an expert opinion on the matter, we cannot say whether the parties might reasonably have regarded the memorandum as comprehensive enough, specific enough, and clear enough to preserve all of the claims at issue.[16] The suggestion in the record that

the adequacy of an informal claim on a case by case basis.").

16. Appellants assert that they "believed that the Refund Claim Memorandum, which described the basis for the Estate's entitlement to the refund in substantial detail, along with numerous IRS forms describing the overpayment filed or executed by the Estate during the ongoing tax controversy with the IRS, were sufficient to serve as an informal refund claim." *Cf. Berberich v. Payne & Jones, Chtd.,* 3 F.Supp.2d 1199, 1200, 1203 (D.Kan. 1998) (holding that where plaintiff clients alleged that their attorneys negligently failed to timely file protective refund claims with the IRS on the clients' behalf and engaged new counsel who was continuing to pursue the refund claims despite passage of the filing deadline, under the theory that the claims were allowable under the "mitigation provisions" of the Internal Revenue Code, no cause of action for negligence had yet accrued against the original attorneys, because the clients' "administrative claim for these tax refunds and interest pursuant to the mitigation provisions ... ha[d] not been determined by the IRS," because "[i]f plaintiffs [were] successful on their pending claim with the IRS, plaintiffs [would] recover the same refunds plus interest that [were] the subject of their claims in this action," and because

"the results of the underlying dispute between plaintiffs and the IRS may determine whether [the defendant lawyers were] negligent in failing to advise plaintiffs to file protective refund claims," conclusions the court reached notwithstanding expert testimony that the clients' "position under the mitigation provisions was 'extremely weak' "); *Poole v. Lowe,* 615 A.2d 589, 593 (D.C.1992) (holding that client's cause of action against her lawyer for agreeing to settle client's workers compensation claim without her consent did not accrue until agency commissioner approved the settlement, because conclusion that the cause of action accrued earlier than that "would ignore altogether the commissioner's authority to approve or disapprove the agreement"); *Gen. Accident Ins. Co. of Am. v. Schoendorf & Sorgi,* 202 Wis.2d 98, 549 N.W.2d 429, 435 (1996) (holding that any injury to client from lawyer's preparation of pension and profit-sharing plan that failed to comply with applicable provisions of Internal Revenue Code was "inchoate until the plan could no longer be brought into compliance for the assessment years," i.e., until the client "was notified by the IRS ... that its plan was disqualified"); *Moss v. Stockdale, Peckham & Werner,* 47 Cal.App.4th 494, 54 Cal.Rptr.2d 805, 809 (1996) (holding, in legal malpractice action based on lawyer's failure

the IRS may have regarded the 1999 protective claim as adequate to allow payment of the *entire* refund claim related to the death tax credits itself suggests that, during the earliest years involved here, the parties might reasonably have thought they could rely on the 1999 protective filing to preserve all their refund claims— i.e., that there is "a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle" appellants to avoid dismissal. *Early,* 959 F.2d at 79. Moreover, Jenner's May 22, 2000 email suggests, as one possibility, that whether appellants had reason to know of something more than "uncertain or inchoate" injury from appellees' action in allowing the deadlines to pass depends on whether the first refund claim, which presumably all parties wished not to jeopardize by the inopportune filing of new claims, had been paid by the time formal claims for additional refunds were due.

For these reasons, we agree with appellants that neither from the face of the Complaint nor from the undeveloped record can it fairly be said that, for statute of limitations purposes, appellants must be charged with knowledge of their injury when the August 20, 2000 and July 12, 2001 filing deadlines were missed.

That said, we cannot agree with appellants that their cause of action did not accrue until they settled their refund claim with the IRS. In *Wagner,* we held that the injury from the defendant lawyers' mishandling of discovery in the clients' medical malpractice lawsuit remained "uncertain or inchoate" until the lawsuit was resolved "either by verdict or ruling in court or by settlement," because the issues were "resolvable only by jurors who reasonably could differ on the evidence." *Wagner,* 847 A.2d at 1156, 1157 n. 9. In *Weisberg,* by contrast, the injury became more than speculative when the government *pled* the FTCA statute of limitations as an affirmative defense.[17] 390 A.2d at 996. Here, we conclude, the equivalent of the jury verdict in *Wagner* and the government's pleading the statute of limitations as an affirmative defense in *Weisberg* was the IRS's definitive announcement of its position "disput[ing]" the QHCs' interpretation about the allowability of the refund claims not filed by the statutory deadline.[18]

to bring underlying bad-faith insurance lawsuit within limitations period established by statute that generally mandated dismissal of untimely filed actions, that "[i]f any of the exceptions to mandatory dismissal may have been applicable ..., they would necessarily constitute the foundation for disputed issues of fact as to the date of [client's] actual injury").

**17.** In *Bleck,* we held that the injury occurred when the defendant lawyer missed a contractual deadline for commencing an action against the client's insurer, *see* 955 A.2d at 715, but we also cited the general rule that injury from passage of a statute-of-limitations deadline occurs when the client's action is "legally subject to dismissal." *Id.* at 716. Because "[t]he statute of limitations is an affirmative defense which ... may be waived if not promptly pleaded," *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d

724, 734 (D.C.2000) (citations and internal quotation marks omitted), a matter is not legally subject to dismissal until the statute of limitations bar is pled. As a practical matter, however, injury from passage of a statute-of-limitations deadline might be known, prior to any pleading, if the other party makes it clear that the statute of limitations would be relied on as a defense should litigation be initiated.

**18.** This is consistent with our and other courts' holdings in a variety of cases involving the issue of when a cause of action accrues for negligent handling of a tax matter. *See, e.g., Ideal Elec.,* 817 A.2d at 808, 810–11 (holding that the appellant company's professional-negligence cause of action accrued upon the company's receipt in 1995 of an IRS agent's memorandum that "dealt with [appellant's] unbilled receivables and calculated the back taxes, penalties, and interest that appellant ... owed the IRS due to its incorrect

At the latest, appellants knew or should have known of their injury—and their cause of action accrued—when they learned of the IRS's definitive position.

From the Complaint and its attachments and the trial court record, we cannot discern when the IRS asserted its position disputing the QHCs' interpretation; as noted above, the Complaint plainly states that "[t]he IRS disputed this interpretation [about the efficacy of the Refund Claim Memorandum to protect all of their refund claims]," but does not say when that occurred. It appears that the IRS has some discretion with respect to whether a protective claim is sufficient in detail and scope to cover later-asserted claims, see United States v. Andrews, 302 U.S. 517, 521, 58 S.Ct. 315, 82 L.Ed. 398 (1938)—meaning, for our purposes, that it is possible that the IRS (or the Joint Committee on Taxation) weighed or mulled over the QHCs' claims for some time before announcing its position.[19] We have no basis for surmising whether the IRS might have disputed the QHCs' interpretation at the outset when the QHCs' new counsel pursued the claims, or whether the agency announced its interpretation only after extended study. We can (and do) assume that the IRS "disputed [the QHCs'] interpretation" well before the settlement with

the IRS was actually approved by Congress and executed; the approval and execution almost surely were preceded by a period of negotiations after the IRS had announced its position. But without a fuller record about when the IRS asserted definitively that the statutory deadline was a bar to payment of a portion of the refund claim, we are not prepared to hold that the fact of appellants' injury from lost refunds was ascertainable, and that their cause of action accrued, by the time they retained new counsel in December 2002 or shortly thereafter.

 Nor can we agree on this record that appellants sustained a separate injury, from incurring attorney's fees, at the time they retained new counsel.[20] To be sure, "attorney's fees and costs expended as a result of an attorney's alleged malpractice [can] constitute legally cognizable damages for purposes of stating a claim for ... malpractice." Knight, 553 A.2d at 1235. In Knight, where the suit was against a defendant attorney for negligence in drafting a will, the plaintiff legatee began to incur such damages, and thus was "injured," when he had to "pay attorney's fees and court costs both to defend his brother's challenge to the will in [a] trial court, as well as to appeal the lower court's adverse ruling." Id. In Ideal Elec-

reporting of such receivables," even though "the extent of [the company's] injury could not be calculated until [the company] was fined by the IRS in 1997"); Edwards v. Demedis, 118 Md.App. 541, 703 A.2d 240, 247–48 (1997) (holding that plaintiffs' cause of action against their attorney, for negligently advising them that their transfers of certain funds from the State Retirement System into individual retirement accounts qualified for tax-free treatment, accrued when they received notices from the IRS showing a deficiency and balance due because of the transfer, not years later when the IRS issued the equivalent of a formal notice of deficiency).

19. Our point is not that the IRS "might have waived the ... time bar by failing to assert it," Bleck, 955 A.2d at 716 n. 9, but that the agency might have determined in its discretion that the statutory filing deadline was not a bar to the QHCs' refund claim.

20. The issue of whether incurring the fees charged by a new attorney was a separate injury that started the running of the limitations period was not raised or addressed in Wagner, but we note that the Wagners engaged new counsel on July 31, 1994, and did not file suit against their previous counsel until August 8, 1997 (i.e., more than three years later), but were allowed to proceed with that suit. See 847 A.2d at 1153–54.

*tronic,* the plaintiff company was injured from the payment of fees to a new accountant when the company had to hire the new accountant to re-file past tax returns to substitute for one that had been filed incorrectly using the wrong accounting method. 817 A.2d at 810. Here, by contrast, the facts alleged are consistent with the possibility that, when first retained, the new lawyers were charged with completing work that appellees had not yet performed because of the "wait to bank the first claim" strategy, rather than with undoing or re-doing work that appellants then understood appellees had done negligently. As appellants argue, the record also contains no information about whether the new lawyers charged higher fees than appellees would have charged for the work.[21]

 It may well be that appellants were (or reasonably should have been) aware more than three years before they filed suit that their refund claims were impaired by appellees' omissions, and that they began to incur costs that they recognized were attributable to appellees' negligence a similarly long time before they filed the instant suit. But, on this bare record, we cannot conscientiously conclude that either was the case. "[G]enerally, the complaint must not be dismissed because the court doubts that plaintiff will prevail." *Atkins,* 660 A.2d at 887. As the "part[ies] pleading the statute [of limitations] defense," appellees had "the burden of proof unless the claim [was] barred on its face" (which, we have determined, it was not). *Oparaugo v. Watts,* 884 A.2d 63, 73 (D.C.

2005). Appellees have not met their burden of establishing that appellants incurred more-than-speculative injury longer than three years before they brought this action. Accordingly, the matter must be remanded for further proceedings (including, at the very least, discovery regarding facts material to the issue of when appellants' cause of action accrued).

## B. Whether the Running of the Limitations Period Is Tolled for the Minor Heirs

 We next address the issue of tolling for the minor heirs pursuant to D.C.Code § 12–302(a) (2001) (a matter that will be relevant if, after discovery and/or the presentation of evidence, the court should determine again, or a jury should find, that appellants were injured more than three years before they filed this suit).

 To recap, appellants' argument is that even if the cause of action accrued for the adult appellants more than three years before this suit was filed, the QHC appellants who are minors, or their proper representatives, may bring action within the time limited after the disability is removed—i.e., within three years after the minor QHCs' eighteenth birthdays, which they had not reached at the time suit was filed. *See* D.C.Code § 12–302(a) (2001). In rejecting this argument, the trial court reasoned in part that the right of action against appellees for negligent performance of the Escrow Agreement belonged to the Escrow Agent, who, the court as-

---

**21.** The fact that the Complaint sought as damages "attorneys' fees and costs incurred as a result of bringing this lawsuit" may be taken as an admission that appellants incurred injury in connection with preparing the instant suit, but this does not answer the question of when they first incurred costs attributable to professional negligence. *Cf. Berberich,* 3

F.Supp.2d at 1203–04 ("[W]hile the fees plaintiffs have paid their new attorney may ultimately constitute damages attributable to defendant's alleged negligence, plaintiff has not offered any evidence at this time that such damages are the result of defendant's negligence.").

sumed, was (or functioned as) a trustee for the QHCs. On this assumption, the court applied the general rule that "a beneficiary [of a trust] cannot bring an action directly against a third-party wrongdoer," *Rearden v. Riggs Nat'l Bank*, 677 A.2d 1032, 1037 (D.C.1996). As appellants point out, however, "[a] critical element in the creation of an express trust is the settlor's manifestation or external expression of his intention to create a trust." *Stern v. J. Nichols Produce Co.*, 486 A.2d 84, 88 (D.C.1984) (citation and internal quotation marks omitted). Nothing in the Complaint describes, and nothing in the Escrow Agreement (a copy of which appellants filed with their opposition to the motion to dismiss) evinces, any intent by the parties to create a trustee/beneficiary relationship between the Escrow Agent and the QHCs. We therefore agree with appellants that, at least on the present record, the tolling issue is not correctly resolved under the reasoning the trial court applied.

We have considered whether the principle that a trust beneficiary "is precluded from maintaining an action against the third person" "upon a contract which the trustee holds in trust" [22] might apply in this case because of the role played, in the matters under discussion, by individuals who are representatives of trusts established for the benefit of the minor QHCs. Specifically, we have considered whether the right of action belongs to these trustees, for whom the statute of limitations is not tolled under D.C.Code § 12–302(a). The present record does not enable us to answer this question in a manner so as to affirm the trial court's ruling on the tolling issue. The Complaint asserts that "Plaintiffs" entered into a contract with appellees to pursue the tax refund claims. As already described, the "Plaintiffs" include individuals identified in their capacities both "as guardian[s] ad litem for" and "as representative[s] of the ... trust[s]" for minor QHCs J.C., N.B.L., and M.F.[23] The record does not contain the instruments that created the trusts for the minor QHCs, and we do not know whether the trusts, rather than the individual QHCs, came to own the QHCs' interest in the contract with appellees or the QHCs' interest in the tax refunds (and whether the trustees were proper parties to bring the instant suit).[24]

The trial court rejected the minor QHCs' tolling argument for the additional reason that "where a guardian is appointed, 'there is no logical reason to prevent the running of the statute of limitations inasmuch as that guardian or conservator is fully authorized to employ attorneys and bring actions on their behalf'" (quoting *U.S. Fidelity & Guaranty Co. v. Conservatorship of Melson*, 809 So.2d 647, 654 (Miss.2002)). The court cited a rule that, according to the Annotation at 1 A.L.R.6th 407, a majority of jurisdictions follow in

22. RESTATEMENT (SECOND) OF TRUSTS § 327, at (1) and cmt. a. (1959).

23. The individuals identified "as guardian[s] ad litem for" and "as representative[s] of the ... trust[s]" for the minor QHCs also are among the parties to the Escrow Agreement.

24. We do see from the "Representations and Warranties" section of the GSA (sections 36.2 and 36.3) that, at the time the GSA was executed, Hillbroom and his then-guardian ad litem represented that they had "assigned their interests in the matters that are the subject of this Agreement to the J.L.H. Trust," while the minor QHCs represented "that they have not assigned their interests in the matters that are the subject of this agreement [including, per section 11.1 of the GSA, the "QHC Tax Refunds"] to anyone." Appellants asserted in their opposition to the motion to dismiss that "any Estate tax refunds are to go to the QHCs' Escrow Agent ..., who then distributes the funds to the QHCs who, in turn, place the funds in their trust."

applying their tolling statutes. *See* Michele Meyer McCarthy, Annotation, *Effect of Appointment of Legal Representative for Minor on Running of State Statute of Limitations Against Minor,* 1 A.L.R.6th 407 (2005) ("In addressing the issue of whether the action is time-barred when a person entitled to the benefit of the state tolling statute by virtue of the disability of minority has a legal representative who is not under a disability, ... a majority of courts hold[ ] that the respective state tolling statute does not prevent the running of the applicable limitations period where the right of action or legal title is in the legal representative ..., while a minority of courts have held that the applicable statute of limitations remains tolled by virtue of a potential plaintiff's disability of minority, notwithstanding that the right of action vests in the legal representative of the minor."). At least in the absence of information about the circumstances under which the minor QHCs' guardians ad litem were appointed and the scope of their legal duties, we decline to conclude that their appointment makes the benefit of the statutory tolling provision unavailable to the minor QHCs.

In sum, "[o]n this record, it is not clear that [the minor QHC] appellant[s] could present no set of facts that would entitle [them] to relief from the limitations bar." *Oparaugo,* 884 A.2d at 75. We conclude that further development of the record as indicated above must precede a ruling on whether this action may proceed as to the minor QHCs even if it is established that this action is time-barred as to the other plaintiffs/appellants. Thus, at the very least, "it was premature to dismiss the case against [the minor QHCs] based on a claim of the bar of limitations...." *Id.*

For the foregoing reasons, the judgment of the trial court is reversed and this matter is remanded for further proceedings consistent with this opinion.

*So ordered.*