DISTRICT OF COLUMBIA (Nos. 87–1330 & 87–1494), Cumbari Associates, Inc. (No. 87–1331), and Joseph E. Pignataro (No. 87–1331), Appellants,

v.

Harry CAMPBELL, Appellee.

Nos. 87–1330, 87–1331 and 87–1494.

District of Columbia Court of Appeals.

Argued April 24, 1990.

Decided Oct. 2, 1990.

Susan S. McDonald, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellant District of Columbia.

Joseph F. McBride, with whom John C. Hanrahan, Silver Spring, Md., was on the brief, for appellants Cumbari Associates, Inc. and Joseph E. Pignataro.

Peg Shaw, with whom Carol Blumenthal, Washington, D.C., was on the brief, for appellee.

Before NEWMAN,\* FERREN, and FARRELL, Associate Judges.

FERREN, Associate Judge:

This case arises out of a payment dispute between a subcontractor and a prime contractor on the District of Columbia's project to renovate residential housing in the Bates Street area.[1] Appellee Harry Campbell, a partner in Cammore Enterprises ("Cammore"), the subcontractor, sued Cumbari Associates, Inc. ("Cumbari"), the general contractor, and its sole stockholder and officer, Joseph E. Pignataro, for renovation work Cammore performed on ten Bates Street project houses. Campbell prevailed. Cumbari and Pignataro, as appellants, assert numerous grounds for reversing the jury's verdict finding them jointly and severally liable for $133,800.06 in contract damages and $54,672.07 in quantum meruit. We reject all their arguments and summarily affirm the judgment against them in Part IV. of this opinion.

Campbell also sought to hold the District of Columbia liable for Cumbari's obligation because the District failed to require Cumbari to obtain a payment bond before awarding Cumbari a contract on the Bates Street project. Prime contractors on public work projects are required to obtain such a bond under D.C.Code § 1–1104 (1987) (the "Little Miller Act").[2] The District moved

---

\* Associate Judge NEWMAN concurs in the results only.

 Associate Judge STEADMAN was originally assigned to this case and participated at oral argument but subsequently recused. Associate Judge NEWMAN was assigned to take his place.

1. The Bates Street project was undertaken by the District to provide low- and medium-income housing by renovating more than 150 houses in the area bounded by P and Q Streets and by North Capitol and Third Streets, N.W.

2. Section 1–1104(a) provides:
 Before any contract, exceeding $25,000 in amount, for the construction, alteration, or repair of any public building or public work of the District of Columbia is awarded to any person, such person shall furnish to the District of Columbia the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor": (1) a performance bond ... for the protection of the District of Columbia; (2) a payment bond with a surety or sureties satisfactory to the Mayor for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person. Whenever the total amount payable by the terms of the contract shall be not

for summary judgment before trial and for a directed verdict at trial. These motions were denied. After the close of evidence, the trial court granted a directed verdict for Campbell against the District under two alternate theories: (1) the District was negligent in failing to require Cumbari to obtain a payment bond; and (2) Campbell was a third-party beneficiary of a contract between the District and Cumbari, which the District breached by failing to enforce the Little Miller Act. The District's motion for judgment notwithstanding the verdict was denied. On appeal, the District repeats the arguments made to the trial court: that there is no private cause of action against the District for a negligent failure to enforce the Little Miller Act, that Campbell cannot recover under a third-party beneficiary theory, and that Campbell's suit against the District is barred in any event because he failed to comply with the notice requirements of D.C.Code § 12–309 (1989).

We conclude that Campbell did not comply with the notice requirements of § 12–309. In addition, we reject the two theories on which the trial court relied to exempt Campbell from the requirements of § 12–309. We therefore conclude Campbell's negligence claim against the District is barred. We further conclude that, although § 12–309 does not erect a barrier to contractual claims against the District, the District did not breach any contractual duty to Cumbari for which Campbell could recover as a third-party beneficiary. Accordingly, the judgment against the District is vacated and the case is remanded to

the trial court with instructions to enter judgment in the District's favor.

## I.

Although the facts giving rise to this dispute are complex and the record in this case is voluminous, most of those facts are relevant only to the arguments of Cumbari and Pignataro discussed summarily in the last part of this opinion. We therefore outline only the facts germane to the question of the District's liability, as follows: (1) the District contracted with Cumbari to renovate completely at least twenty-one houses in the Bates Street area, as well as to do other miscellaneous "customer service" and clean-up work at a number of other houses, for a total price of approximately $1.6 million; (2) the District did not require Cumbari to obtain a payment bond; (3) Campbell and Pignataro agreed with one another that Cumbari would subcontract the renovation work on ten of the houses in the Bates Street project to Cammore Enterprises; (4) Cammore performed most, but not all, of the contracted renovation work on the ten houses, as well as some "extra work"—additional work on those ten and other houses; (5) Cumbari failed to pay Campbell the full amount Campbell claimed he was owed; (6) Campbell's claim against Cumbari and Pignataro was based on both contract and quantum meruit theories; (7) the amount claimed by Campbell fluctuated throughout the course of the litigation; and (8) Campbell notified the District of his claim against the District by filing a complaint in the Superior Court.

more than $1,000,000, the payment bond shall be in a sum equal to one-half the total amount payable by the terms of the contract. Whenever the total amount payable by the terms of the contract shall be more than $1,000,000 and not more than $5,000,000, the said payment bond shall be in a sum equal to 40 per centum of the total amount payable by the terms of the contract. Whenever the total amount payable by the terms of the contract shall be more than $5,000,000 the payment bond shall be in the sum of $2,500,000.
This provision is part of the "Little Miller Act," so-called because of its similarity of the federal Miller Act, 40 U.S.C. §§ 270a–270d (1988). *Dis-*

*trict of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.,* 254 U.S.App.D.C. 374, 376, 797 F.2d 1041, 1043 (1986). "In effect, the payment bond provides 'an alternative remedy to the mechanics' liens ordinarily available on private construction projects.'" *Hartford Accident & Indem. Co. v. District of Columbia,* 441 A.2d 969, 971 n. 2 (D.C.1982) (quoting *J.W. Bateson Co., Inc. v. United States ex rel. Bd. of Trustees of the Nat'l Automatic Sprinkler Indus. Pension Fund,* 434 U.S. 586, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978)); *see also* D.C.Code §§ 38–101, 38–103 (1990) (discussing mechanics' liens and subcontractors' liens, respectively).

## II.

■ As a threshold matter, we must decide whether Campbell has met statutory notice requirements. D.C.Code § 12–309 provides:

An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

This provision is designed "to (1) protect the District of Columbia against unreasonable claims and (2) to give reasonable notice to the District of Columbia so that the facts may be ascertained and, if possible, deserving claims adjusted and meritless claims resisted." *Pitts v. District of Columbia,* 391 A.2d 803, 807 (D.C.1978).

Campbell does not claim to have notified the Mayor of the District of Columbia in any manner other than by filing his complaint.[3] Although it was arguably an open question at the time this suit was filed, we have since stated unambiguously that the filing of a complaint does not satisfy the notice requirement of § 12–309. *See (William) Campbell v. District of Columbia,* 568 A.2d 1076, 1078 (D.C.1990); *see also Gwinn v. District of Columbia,* 434 A.2d 1376, 1378 (D.C.1981) ("notice under § 12–309 is a 'condition precedent' to filing a suit against the District"). Campbell, therefore, did not give any notice adequate to satisfy the requirements of § 12–309.[4] The question remains, however, whether § 12–309 applies to any or all of Campbell's claims.

The trial court ruled that Campbell's claims were exempt from § 12–309 for three reasons: (1) the District as an entity was aware of both the breach of duty and the injury, as in *Shehyn v. District of Columbia,* 392 A.2d 1008 (D.C.1978); (2) Campbell's claim was for liquidated—not unliquidated—damages; and (3) § 12–309 has never been held to apply to contractual obligations. We address each of these theories in turn.

### A.

■ In *Shehyn* we stated that § 12–309 applies to two types of claims: (1) claims arising out of the tortious conduct of employees of the District, 392 A.2d at 1013–14, and (2) claims "where the District itself is in breach of a duty but where, although necessarily aware of the breach, the District is not necessarily aware of the injury produced by the breach." *Id.* at 1014 (citation and parenthetical omitted). Accordingly, as to *Shehyn's* second category, § 12–309 compliance will be unnecessary only if the District is aware both of the breach and of the injury.

In this case, the trial court concluded that, as in *Shehyn,* the District as an entity was aware both of its breach of duty and of the injury produced by the breach. The court defined the District's breach of duty as its failure to require Cumbari to obtain a payment bond. The court defined the injury as "the lack of insurance guaranteeing payment to [Campbell] in the event the contractor failed to pay." It analogized the injury to "a negligent surgery case whe[re] ill effects are not manifested until years after the event causing injury." The court concluded that, even before Campbell was on notice of the District's breach or of his injury, the District was aware of both the breach and the injury because "[i]n failing to insist on the payment bond, the District as an entity was on notice that its

---

**3.** Campbell has not claimed that his several letters to District officials requesting assistance in pressuring Cumbari to pay its debt constituted notice under D.C.Code § 12–309, and, in any case, we believe they would not.

**4.** Because Campbell never notified the Mayor of his claim—other than by filing his complaint—we are not faced with the question whether notice was given within six months after the injury or damage was sustained. Accordingly, we need not determine when the injury or damage in this case occurred.

action deprived subcontractors such as [Campbell of] the right to a security guaranteed by statute."

We cannot agree with the trial court's characterization of the injury to Campbell as "the lack of insurance." The injury to subcontractors such as Campbell occurs not when a general contractor fails to post a payment bond but, rather, when the general contractor fails to pay the subcontractor for work performed. Until the point when Cumbari failed to pay Campbell a portion of the amount owed, Campbell had not suffered actionable damage. The trial court's analogy to medical malpractice cases, where the injury does not manifest itself for years after the negligence, is misplaced. There was no injury which could manifest itself here until Cumbari failed to pay Campbell. In short, in light of the fact that the injury to Campbell was Cumbari's failure to pay, not Campbell's lack of insurance, this is not a case where the District as an entity could have been aware of the injury to Campbell at the time it occurred. Campbell's claim, therefore, is not exempt from the notice requirements of § 12–309 under the *Shehyn* doctrine.

### B.

■ We turn next to the question of whether Campbell's claim was for liquidated or unliquidated damages. Section 12–309 applies only to actions for "unliquidated damages to persons or property." "A debt is liquidated if 'at the time it arose, it was an easily ascertainable sum certain.'" *Hartford Accident & Indem. Co. v. District of Columbia,* 441 A.2d 969, 974 (D.C.1982) (internal quotation omitted).

The trial court concluded that Campbell's claims against the District concerned liquidated damages. This conclusion was based in part on its belief that the injury to Campbell was the lack of a payment bond and in part on the notion that a ceiling on damages may, in some instances, constitute liquidated damages. *See Burns v. Hanover Ins. Co.,* 454 A.2d 325 (D.C.1982). The trial court stated:

Whatever the liability of the contractor defendant, for the purpose of [§] 12–309, the District's maximum liability is the amount of the bond the District did not insist the contractor furnish. The exact amount of the required bond can be computed to the penny by consulting the statute, the contract and the contract amendments.

Again, we disagree with the court's analysis. The fact that the parties could ascertain the exact amount of the payment bond which should have been posted[5] is irrelevant to the question whether the damages sought by Campbell were liquidated or unliquidated. Because the injury was Cumbari's failure to pay, the question is whether the amount Cumbari owed Campbell for the work performed by Cammore was liquidated or unliquidated.

The District argues that Campbell's claim was unliquidated because the damages he claimed varied throughout the course of the litigation. Indeed, Campbell's original complaint alleged that he had had a contract with Cumbari to renovate ten houses for a total of $333,500 and that that contract was amended to include two categories of "extra work" at an additional price of $38,228.78, for a total contract price of $371,728.78. Nearly a year after filing his original complaint, however, Campbell amended his complaint to add $38,084.13 to the second category of "extra work," for a revised total contract price of $409,812.91. Because Campbell conceded in his complaint that Cumbari had paid him $126,500 of the total amount, his original complaint sought $245,228.78 and the amended complaint sought $283,312.91 in damages. At trial, however, Campbell conceded that, in addition to the $126,500 Cumbari paid directly to him, Cumbari had also paid $70,430.03 for Cammore's supplies and subcontracted labor, reducing the total owed to $212,882.88. Later during trial, Campbell acknowledged an additional $7,849.78 in indirect payments by Cumbari, bringing the total amount owed down to $205,033.10. Such fluctuation in itself likely would be sufficient grounds for us to

---

5. The trial court figured this amount was $647,444.40.

conclude that the damages Campbell claimed were unliquidated. *See Hartford Accident,* 441 A.2d at 974 (noting that, because amounts claimed for unpaid contract balance and for change order fluctuated throughout litigation, they were not liquidated). There is an additional reason, however, why we conclude Campbell's claim was unliquidated.

In *Giant Food, Inc. v. Jack I. Bender & Sons,* 399 A.2d 1293 (D.C.1979), while holding that the plaintiff's liquidated claim was not converted into an unliquidated debt by the defendant's unliquidated counterclaim, we emphasized that we were not dealing with "a case in which substantial performance of a contract or a quantum meruit claim was at issue." *Id.* at 1302. Referring to claims which sounded in quantum meruit, we stated that "[s]uch damages are by their very nature unliquidated and must be the subject of controversy and proof at trial." *Id.* at 1300. Such was the situation here, where Campbell based his claim on alternate theories—contract and quantum meruit—and the jury's award was based on both theories—$133,800.06 in contract damages and $54,672.07 in quantum meruit.

The reason Campbell needed to rely in part on a quantum meruit theory is clear from the evidence. Campbell testified that, for some of the "extra work" Cammore performed, he and Pignataro did not agree to a set price but to a formula for determining the price. As to the remainder of the "extra work," Campbell testified that there was no agreement on a price, only an agreement to work out a price later. Moreover, Campbell admitted that Cammore did not complete work on two of the ten houses it had contracted with Cumbari to renovate completely. Although Campbell testified that one of the two houses was 98 percent complete and the other was 95 percent complete, a District official testified that one of the two houses was only 65 to 70 percent complete. Thus, the price of the renovation work and the "extra work" performed by Cammore was not "an easily ascertainable sum certain" but, rather, was "the

subject of controversy and proof at trial." We therefore conclude that this suit involved a claim for unliquidated damages.

Accordingly, we reject the claim that Campbell was exempt from the notice requirements of § 12–309 on a theory that his claim was liquidated. Because we have now rejected the only two theories that would exempt Campbell's tort claim against the District from the notice requirement of § 12–309, we conclude that Campbell's negligence claim is barred by his failure to give the District adequate notice under § 12–309.[6] We must, nonetheless, address the question whether § 12–309 applies to Campbell's contract claim against the District.

### C.

■ As the trial court noted, we have never actually applied § 12–309 to a claim for breach of contract. The closest we have come to doing so was in *Shehyn,* where we stated that § 12–309 did not apply to the contract claim at issue because the District as an entity was aware of both the breach of contract and of the injury produced by the breach. 392 A.2d at 1014. Arguably, the analysis adopted by *Shehyn* may have implied that § 12–309 could apply to a contract claim against the District in which the District was not aware of either the breach or of the injury produced by the breach—if such a category of cases actually exists. At odds with this somewhat attenuated interpretation, however, is the plain language of the statute, which applies to actions for unliquidated "damages to person or property."

■ The phrase "damages to person or property" is distinctly inapplicable to claims based on a breach of contract. BLACK'S LAW DICTIONARY defines the word "damages" as follows:

A pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his [or her]

---

**6.** Accordingly, we do not address the substantive question whether a suit can be maintained against the District for negligence in failing to enforce the payment bond provision of the Little Miller Act.

person, property, or rights, through the unlawful act or omission or negligence of another. A sum of money awarded to a person injured by the tort of another. BLACK'S LAW DICTIONARY 351–52 (5th ed. 1979). Thus, according to the plain meaning of the language of § 12–309, it applies only to actions sounding in tort. *See generally Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C. 1983) (en banc) (general rule of statutory construction is that intent of lawmaker is to be found in language used). Moreover, the District has not pointed to any legislative history indicating a contrary legislative intent, *i.e.,* an intent to apply the notice requirements of § 12–309 to contract claims. *See id.* at 754 (even where words of statute have "superficial clarity," review of legislative history may reveal ambiguities). Finally, our reading of the language is consistent with the District's greater need to receive notice in order to ascertain the facts in the tort context, where the District will often be unaware of any injury caused by a breach of its duty, than in the contractual context, where—almost by definition—the District is on notice that any breach will result in an injury.

Accordingly, Campbell's failure to give notice adequate to comply with § 12–309 does not bar his contract claim against the District. We turn, therefore, to the merits of the court's decision to direct a verdict in Campbell's favor on a third-party beneficiary theory.

### III.

■ A third party may sue on a contract if the contracting parties intended the third party to benefit. *See Bay Gen. Indus., Inc. v. Johnson,* 418 A.2d 1050, 1055 (D.C.1980). The contract at issue here is the contract between the District and Cumbari. Campbell argues that "[b]ecause the statute [D.C.Code § 1–1104(a) ] makes a payment bond mandatory, that statute is ... as much a part of the contract as if the

Little Miller Act were expressly incorporated into the terms of the prime contract," citing *Javins v. First Nat'l Realty Co.,* 138 U.S.App.D.C. 369, 428 F.2d 1071, *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970). Campbell argues further that Cammore, as a subcontractor on the Bates Street project, was an intended third-party beneficiary of the contractual provision obligating Cumbari to obtain a payment bond. According to Campbell, the District breached its contractual duty "to insist upon a payment bond" and is therefore liable for that breach to Campbell, the third-party beneficiary. The trial court accepted this argument and granted a directed verdict for Campbell.

We agree with Campbell that the requirements of the Little Miller Act are incorporated into the contract between District and Cumbari. Nonetheless, we cannot accept Campbell's third-party beneficiary theory as establishing the District's liability. If we treat the Little Miller Act as part of the contract between Cumbari and the District, then clearly it is the contractor, Cumbari, who has promised the District to obtain a payment bond. *See* D.C.Code § 1–1104(a) ("such person [the contractor] shall furnish to the District of Columbia the following bonds ..."). Thus, Cumbari is the promisor and the District is the promisee.

■ In the vast majority of cases, the third-party beneficiary's action lies only against the promisor. *See* RESTATEMENT (SECOND) OF CONTRACTS § 304 (1981) ("[a] promise in a contract creates a duty *in the promisor* to any intended beneficiary to perform the promise") (emphasis added). The only category of cases mentioned in the RESTATEMENT where the beneficiary may maintain an action against the promisee is where the beneficiary had a previous enforceable claim against the promisee and the promisor essentially assumed the promisee's obligation.[7] *See id.* at § 310(1) &

---

7. The RESTATEMENT indicates that the District, in this case and for purposes of this question, stands on the same footing as other promisees. *See* RESTATEMENT (SECOND) OF CONTRACTS § 313(1) ("The rules stated in this Chapter apply to contracts with a government or governmental agency except to the extent that application would contravene the policy of the law authorizing the contract or prescribing remedies for its breach.").

comment a. Cammore had no such enforceable claim against the District before the District contracted with Cumbari on the Bates Street project. Thus, while the District as promisee failed to enforce Cumbari's promise, as is the case in many third-party beneficiary claims, this does not change the fact that the promisor, not the promisee, committed the breach. Assuming for the sake of argument that Campbell, as a subcontractor, is an intended beneficiary of the payment bond provision of § 1–1104(a), he therefore could maintain his third-party claim only against the breaching promisor, in this case Cumbari.[8] As a result, the District is not liable to Campbell under a third-party beneficiary theory for its failure to insist that Cumbari obtain a payment bond.[9]

## IV.

We turn to the judgment upon the jury's verdict against Cumbari and Pignataro.

## A.

■ We reject Cumbari's and Pignataro's argument that the suit should have been dismissed for failure to join Julian Moreland, a Cammore partner, as an indispensable party. Moreland testified without contradiction that the partnership dissolved in November 1983 and that he had assigned any interest he may have had in the outcome of the suit to his former partner, Campbell.

## B.

■ Cumbari and Pignataro also argue that the evidence was insufficient to submit to the jury on a number of issues. We reject each of these contentions. On the issue of whether an oral contract existed, Campbell testified that, after some initial

---

8. In this case, of course, Campbell had no need to invoke a third-party beneficiary theory against Cumbari because his claim arose directly from his own contract with Cumbari.

9. This is not to say that the District has no duty to enforce its own laws. We are saying merely that the District's duty to enforce § 1–1104 does not arise from its status as a party to a construction contract but, rather, from its status as the government charged with enforcing the law.

agreements, he and Pignataro finally agreed to a price of $333,500 for complete renovation of ten houses, plus an additional sum, to be determined later, for the "extra work." Pignataro admitted the existence of a final contract for $333,500; he merely contended this price also included all the "extra work."

On the issue of whether there was a breach of contract, the record is replete with evidence that Cumbari did not pay the full amount owed to Campbell. There is no merit to the claim that Campbell's evidence on the amount owed was "so confusing and contradictory that it was tantamount to a failure of proof."

■ We also conclude there was sufficient evidence about the value of the work performed to submit Campbell's quantum meruit claim to the jury. *See TVL Assocs. v. A & M Constr. Corp.*, 474 A.2d 156, 159 (D.C.1984). Campbell's evidence of the reasonable value of renovating each house included the District's original cost estimates and the price the District actually paid Cumbari for renovating each house. Campbell also introduced evidence of the price Cammore charged as a subcontractor for rehabilitating similar houses in the area. Campbell's evidence of the reasonable value of the "extra work" consisted primarily of invoices. Pignataro admitted that he had reviewed those invoices and agreed to add $64,500 to the price to which he had originally agreed.

■ The final sufficiency question concerns the corporate veil-piercing issue: whether Pignataro could be held personally liable for Cumbari's obligations to Cammore. In order to pierce the corporate veil, Campbell had the burden to prove "(1) unity of ownership and interest, and (2) use

Because the duty arises from a non-contractual source, a proper action for a breach of the duty can lie only in tort. In this case, of course, Campbell did not comply with the notice requirements necessary to maintain a tort action against the District, see *supra* Parts II.A. and II.B., so we do not decide whether the District is liable for damages arising from a negligent breach of its duty to enforce § 1–1104.

of the corporate form to perpetrate fraud or wrong." *Vuitch v. Furr,* 482 A.2d 811, 815 (D.C.1984). Cumbari and Pignataro concede there is a sufficient unity of interest to meet the first prong of the test. As for the second prong, Campbell introduced evidence of more than twenty checks, totalling more than $85,000, signed by Pignataro and drawn on Cumbari's corporate bank accounts during the time of the Bates Street project—a time when legal judgments were outstanding against Cumbari. The checks were made out to either Cammore, Campbell, or Elliott Rogers (another subcontractor working for Pignataro on the Bates Street project). The checks had each been cashed, often with an illegible endorsement on the back. Nonetheless, Campbell and Moreland (partners in Cammore) and Rogers—the purported payees— each testified that they had never seen the checks prior to conducting discovery in connection with this lawsuit and that they had never received the funds from those checks. This evidence was sufficient for the jury to infer that the corporate form was used to perpetrate a fraud or wrong.

### C.

 In addition, we conclude the court did not err by refusing to instruct the jury to subtract from the amount Cumbari and Pignataro owed Campbell various payments totalling approximately $100,000 which an entity called CPM made to Campbell's suppliers and subcontractors. The principals of CPM included Campbell, Pignataro, and Moreland, but, despite any inferences to be drawn from these particular relationships, the jury was free to credit testimony that the money was intended to be a loan to Cammore, not a payment on Cammore's behalf.

### D.

 Cumbari and Pignataro also challenge a number of evidentiary rulings, none of which, we conclude, merits reversal. The trial court did not abuse its discretion in admitting testimony about the total price of the contract, as amended, between the District and Cumbari. This information, as the court noted, was relevant to the amount of the payment bond that should have been posted—a bond which, under Campbell's theory of the case, established a limit on the District's liability.

 Likewise, the court did not abuse its discretion in admitting the District's estimate of the cost of renovating the various houses in the Bates Street project; this information was relevant to Campbell's quantum meruit claim in that it was evidence of the reasonable value of the work performed by Cammore.

 Next, we do not perceive any prejudice from the court's decision to allow Julian Moreland to testify that Cammore was a minority-owned enterprise. Moreland was merely stating for the record what the jurors could plainly see: both he and his former partner, Campbell, were black. Cumbari and Pignataro also challenge the court's decision to allow a witness to read into the record three paragraphs from the prime contract describing the District's affirmative action policies. At the time the evidence was introduced, the court had not yet ruled that Cammore's status as a minority-owned enterprise was irrelevant to whether it was a third-party beneficiary of the prime contract. Even if the admission of this testimony was error, we conclude it was harmless.

 The court also did not abuse its discretion in admitting evidence of five judgments against Cumbari as relevant to the question whether the corporation was being used to perpetrate a wrong. *Cf. Vuitch,* 482 A.2d at 815 (no need to show fraud directly tainting obligation upon which plaintiff is suing in order to pierce corporate veil).

 Finally, Pignataro argues the trial court improperly permitted use of extrinsic evidence for impeachment on a collateral matter when it allowed Pignataro to be impeached with his failure to list, in his answer to an interrogatory, five judgments against Cumbari, as well as a lawsuit filed against Pignataro by his parents. Even assuming the court erred in allowing such impeachment, we conclude the error was

harmless, particularly in light of the fact that the court allowed Pignataro to explain both his failure to answer the interrogatory correctly and the circumstances surrounding the various lawsuits.

### V.

We reverse the trial court's ruling directing a verdict in favor of Campbell against the District and remand the case with instructions to enter judgment in favor of the District. We affirm the judgment against Cumbari and Pignataro.

*So ordered.*