*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CV-1034

K.L. BLACKWELL, APPELLANT,

V.

PLANET FITNESS FRANCHISING, LLC, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2024-CAB-000124)

(Hon. Yvonne M. Williams, Motions Judge)

(Submitted February 12, 2026                    Decided May 21, 2026)

*Kenneth L. Blackwell*, pro se.

*Leslie Paul Machado* was on the brief for appellees.

Before BECKWITH, EASTERLY, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: Appellant K.L. Blackwell regularly visited a Planet Fitness exercise facility in southeast Washington, D.C., as the guest of a Planet Fitness "Black Card" member. In a lawsuit against Planet Fitness and three related entities in Superior Court, Mr. Blackwell, proceeding pro se, alleges that on October 26 and 27, 2023, he endured distressing and discomfiting treatment by a

Planet Fitness employee and Planet Fitness did nothing to remedy the situation. Mr. Blackwell's amended complaint asserts several tort claims and a claim for breach of contract. The trial court dismissed the amended complaint for failure to state a claim under Superior Court Civil Rule 12(b)(6). We affirm.

## I. Background

"We summarize the facts as alleged in the complaint." *McCall v. D.C. Hous. Auth.*, 126 A.3d 701, 703 (D.C. 2015). The Planet Fitness Black Card membership program, and Planet Fitness's marketing and policies, form the relevant background for this appeal. Planet Fitness operates commercial exercise facilities that are open to the public. Interested individuals may pay for access to these facilities by subscribing to a membership program, which provides certain benefits in exchange for a monthly fee. One tier of membership, the Planet Fitness Black Card, allows a Black Card member to bring a guest with them to a Planet Fitness location, for no additional charge, while the Black Card member is using that facility. To do so, the Black Card member registers their guest at the front desk and the guest is given a "PF Keytag," an electronic key that allows the guest to swipe in so long as the Black Card member is present.

Planet Fitness markets itself to customers as a "Judgement Free Zone."[1] According to the amended complaint, this means that Planet Fitness promises a "welcoming and friendly community where people [can] feel comfortable regardless of their fitness level," and a "safe, energetic environment, where everyone feels accepted and respected." To help achieve its goal of fostering a "judgement free planet," Planet Fitness maintains an anti-discrimination and anti-harassment policy prohibiting "verbal o[r] physical harassment of any member or team member for any reason."

Mr. Blackwell, who was seventy or seventy-one at the time of the relevant events (he alleges both ages in his complaint), does not allege that he has ever been a Planet Fitness member. Rather, in February 2023, another individual became a Black Card member and allowed Mr. Blackwell to take advantage of his guest pass benefit. Mr. Blackwell registered as a guest at a Planet Fitness location in southeast D.C. by providing his identification, address, and phone number, and he was given a PF Keytag. For several months, Mr. Blackwell used this particular Planet Fitness without incident, sometimes arriving along with the Black Card member and

---

[1] Planet Fitness's "spelling of 'Judgement' (with an 'e') was actually a mistake back in the beginning." The company "considered changing it" but thinks it makes the company "different and really fits with [its] judgement free personality. 😊" Planet Fitness Press Kit at 7, *available at* https://perma.cc/WK4Z-ULYA.

sometimes arriving by himself after the Black Card member had already entered the facility.

Mr. Blackwell alleges that on October 26, 2023, he arrived at the Planet Fitness while the Black Card member was already there, as usual, but that after he swiped in, an employee at the front desk refused to let him enter the facility because he was "not a member." When Mr. Blackwell attempted to explain that he was a guest of a Black Card member who was currently at the facility, the employee allegedly became hostile, said "you don't know who I am" in an angry manner, and refused to shake Mr. Blackwell's hand when Mr. Blackwell tried to deescalate. This unnamed Planet Fitness employee also told Mr. Blackwell that the Black Card member needed to be with him each time Mr. Blackwell entered the facility. Mr. Blackwell, who alleges that he "fear[ed for] his safety" as a result of this interaction, then left with the Black Card member.

On October 27, Mr. Blackwell reported the incident to the assistant club manager by telephone. Later that day, he returned to the facility with the same Black Card member. As the two went to check in, Mr. Blackwell noticed the same employee from the day before fixing him with an "unyielding and psychopathic stare," unblinking, with an "intent and angry expression." When Mr. Blackwell asked why he was doing this, the employee responded "can I help you?" in a "hostile

manner." Mr. Blackwell brought this behavior to the attention of another employee, named "Kevon," who told Mr. Blackwell to leave and threatened to have him barred from the facility. Kevon then called the police, who, after arriving, told Mr. Blackwell that he was not being barred from the facility and that the situation "was not a police matter."

Mr. Blackwell left the facility and asked for his personal information to be removed from the system. Several weeks later, Mr. Blackwell was informed by a Planet Fitness regional manager that none of the Planet Fitness employees involved in these incidents would be disciplined. Mr. Blackwell asserts that a few months after that, on January 4, 2024, the "Defendants" (as a group) "alleg[ed] . . . that Plaintiff was making harassing telephone calls to its facility." Mr. Blackwell claims that the next day "Defendants again falsely accused Plaintiff of making harassing and profane telephone calls to its place of business."

Mr. Blackwell sued Planet Fitness and three entities that allegedly have an ownership interest in Planet Fitness—Ohana Growth Partners, LLC; AGPDC, LLC; and AGPDC Penn Branch, LLC—asserting five causes of action: (1) assault, (2) intentional infliction of emotional distress (IIED), (3) negligent infliction of emotional distress (NIED), (4) negligent hiring, training, supervision, and retention, and (5) breach of contract. The defendants moved to dismiss Mr. Blackwell's

amended complaint under Rule 12(b)(6) for failure to state a claim, and the trial court granted the motion. Mr. Blackwell timely appealed.

## II.    Analysis

A motion to dismiss under Superior Court Civil Rule 12(b)(6) "tests the legal sufficiency of the complaint," so we review an order granting a 12(b)(6) motion de novo. *Tovar v. Regan Zambri Long, PLLC*, 321 A.3d 600, 609 (D.C. 2024) (citation modified). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Any uncertainties or ambiguities in the complaint must be resolved in favor of the pleader." *Id.* (quoting *Hillbroom v. PricewaterhouseCoopers LLP*, 17 A.3d 566, 572 (D.C. 2011)).

We address each of Mr. Blackwell's claims in turn.

### A.    Assault

The tort of assault "results from apprehension of an imminent harmful or offensive contact, in contrast with the contact itself." *Person v. Children's Hosp.*

*Nat. Med. Ctr.*, 562 A.2d 648, 650 (D.C. 1989). To prevail on this claim, Mr. Blackwell must show that (1) the defendants acted "intending to cause a harmful or offensive contact" with him, or intending to cause "an imminent apprehension of such a contact" and (2) he was "thereby put in such imminent apprehension." Restatement (Second) of Torts § 21 (1965); *see Person*, 562 A.2d at 650; *Madden v. D.C. Transit Sys., Inc.*, 307 A.2d 756, 757 (D.C. 1973) ("An essential element of the ancient tort of assault is the intentional putting another in apprehension of an immediate and harmful or offensive conduct"); *see also Valle v. Karagounis*, No. 22-7167, 2024 WL 3738445, at *4-5 (D.C. Cir. Aug. 9, 2024); *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014).

Mr. Blackwell appears to contend that he was assaulted twice: (1) on October 26, 2023, when the unidentified Planet Fitness employee refused to shake Mr. Blackwell's hand and "stat[ed] over and over that '[y]ou don't know who I am' in a threatening, angry and hostile manner," and (2) on October 27, 2023, when that same Planet Fitness employee "intently star[ed]" at Mr. Blackwell in a manner Mr. Blackwell describes as "unyielding and psychopathic," and asked "'can I help you?' in a hostile manner." Regarding this second incident, Mr. Blackwell alleges that his interaction the previous day, combined with his understanding that the defendants possessed Mr. Blackwell's personal information, "worse[ned]" his "fear, apprehension and anxiety." Mr. Blackwell generally argues that he has adequately

pled a claim for assault because the "totality of the circumstances" he alleges—including his assertions that he "suffer[ed] fear, apprehension, anxiety and the threat of imminent bodily harm"—show that he reasonably feared that this unnamed employee would imminently cause him bodily harm.

We are not persuaded that these allegations state a claim for assault. First, we do not credit Mr. Blackwell's bare assertion in the amended complaint that the unnamed employee intended to cause him apprehension of imminent physical contact because that is a legal conclusion that may help "provide the framework" for his assault claim but is "not entitled to the assumption of truth" on its own. *Potomac Dev. Corp.*, 28 A.3d at 544 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Focusing on the amended complaint's factual allegations, Mr. Blackwell alleges that an employee angrily told him "you don't know who I am" on one occasion and that the next day this same employee stared at him for some time in an unsettling and aggressive manner before saying "can I help you?" with a similarly menacing attitude. We do not doubt that these interactions, as alleged in the amended complaint, were unpleasant for Mr. Blackwell, and we accept that they left him feeling shaken and upset. We also accept as true that this unnamed employee was angry with Mr. Blackwell on October 27 because Mr. Blackwell had reported the employee's behavior the previous day.

But the tort of assault requires an act that puts a person in fear of "imminent contact, as distinguished from any contact in the future." Restatement (Second) of Torts § 29 comment b (1965); *id.* § 29 ("An act intended by the actor as a step toward the infliction of a future contact . . . does not make the actor liable for an assault"); *accord Brower v. Ackerley*, 943 P.2d 1141, 1145 (Wash. Ct. App. 1997) (explaining that telephone calls containing the threats "I'm going to find out where you live and I'm going to kick your ass" and "you're finished; cut you in your sleep" were not assaults because "[t]he words threatened action in the near future, but not the imminent future"); *see also Frey v. Town of Jackson*, 41 F.4th 1223, 1241 (10th Cir. 2022) (holding that a TSA agent defendant's statement to the plaintiff that TSA policy required submission to a pat down, and the agent's demand that the plaintiff consent to a pat down, without more, did not place the plaintiff in imminent apprehension of offensive physical contact). And while a verbal threat can constitute an assault if accompanied by other circumstances that put a person in reasonable apprehension of imminent offensive contact, *see, e.g.*, *Vetter v. Morgan*, 913 P.2d 1200, 1203-04 (Kan. Ct. App. 1995) ("Words can constitute assault if together with other acts or circumstances they put the other in reasonable apprehension of imminent harmful or offensive contact." (citation modified)), Mr. Blackwell does not allege that anyone verbally threatened him with bodily harm.

Instead, Mr. Blackwell identifies the unnamed employee's hostile tone of voice, unpleasant words, and intimidating stare as the behavior constituting the assaults. Even if these acts plausibly caused Mr. Blackwell to become concerned for his safety, they are not enough to make it plausible that he feared that he would experience offensive physical contact imminently—that is, with "no significant delay." Restatement (Second) of Torts § 29 comment b; *see Brower*, 943 P.2d at 1145. We have not found a case where a hostile tone, harsh but non-threatening words, and a baleful glare were enough to constitute assault, and we decline to hold here that they are enough. *Cf. Valle*, 2024 WL 3738445, at \*5 (holding that the plaintiffs were not assaulted where the defendants "threatened to call the police on the [plaintiffs] and may have gotten physically close to them"); *Mouton v. Lowe's Home Centers, LLC*, 417 So. 3d 739, 743, 752 (La. Ct. App. 2025) (holding that the plaintiffs did not adequately plead a claim for assault where they alleged that "two employees approached them in a 'military-like phalanx before casting menacing glares at them' and repeatedly harassed and berated them"). Because Mr. Blackwell failed to plausibly allege that he feared imminent offensive physical contact—even assuming that such offensive physical contact was possible at some point later in the future—he has failed to state a claim for assault. *See* Restatement (Second) of Torts § 21, 29; *Person*, 562 A.2d at 650; *Madden*, 307 A.2d at 767; *Valle*, 2024 WL 3738445, at \*4.

### B. Intentional Infliction of Emotional Distress

"To state a claim for IIED, a plaintiff must prove (1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) caused the plaintiff severe emotional distress." *Robertson v. District of Columbia*, 269 A.3d 1022, 1033 (D.C. 2022) (citing *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007)). "To be 'extreme and outrageous,' conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997)).

Looking at the complaint's allegations holistically, Mr. Blackwell alleges the following potentially tortious acts: (1) an unnamed Planet Fitness employee refused to let him enter the facility and said "you don't know who I am" in a hostile and menacing tone; (2) the next day, that same employee stared at Mr. Blackwell in an "unyielding and psychopathic" manner and aggressively asked Mr. Blackwell, "can I help you?"; (3) a second Planet Fitness employee needlessly called the police on Mr. Blackwell during this second incident, and (4) a third (and possibly fourth) Planet Fitness employee twice stated that Mr. Blackwell was harassing them with his phone calls. In addition, Mr. Blackwell appears to argue that the Planet Fitness

employees' conduct on October 26 and 27 was "extreme and outrageous" because of Mr. Blackwell's age (seventy or seventy-one); because the conduct violated Planet Fitness's own anti-harassment policy; and because the conduct violated the guarantees Planet Fitness makes regarding its judgment-free and supportive environment.

We are not persuaded that these allegations, in isolation or taken together, meet the high bar we have set for "extreme and outrageous" conduct. First, while we have held that "[a] plaintiff may state an IIED claim by alleging that the defendant caused the plaintiff to be falsely arrested," *Grimes v. District of Columbia, Bus. Decisions Info., Inc.*, 89 A.3d 107, 114 (D.C. 2014), Mr. Blackwell does not allege that he was arrested and, in fact, alleges that he was told by the police that he "was not being issued a 'bar notice,'" that he "had done nothing illegal," and that "this 'was not a police matter.'" Second, while we appreciate Mr. Blackwell's point that he is among the "elderly" and is thus "particularly" likely to be affected by aggressive behavior, we are not persuaded that Mr. Blackwell's age alone is the sort of "physical or mental condition or peculiarity" that pushed the employees' alleged conduct in this case into extreme and outrageous territory. Restatement (Second) of Torts § 46 comment f (1965) (noting that "the extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress" but cautioning that "major outrage is essential to

the tort"). Indeed, we have held that conduct harsher than the conduct alleged here was not "extreme and outrageous." *See May v. River East at Grandview*, 322 A.3d 557, 574 (D.C. 2024) (holding that a Department of Consumer and Regulatory Affairs inspector's levying of fines against the plaintiffs as they sought to render their home habitable did "not rise to the level of atrociousness that is utterly intolerable in a civilized community"); *District of Columbia v. Tulin*, 994 A.2d 788, 792, 800-01 (D.C. 2010) (holding that an off-duty detective's "harsh words" toward a plaintiff after he suffered a car accident, which included "cursing and using all kinds of profanity," did not constitute "extreme and outrageous" conduct).

Third, while *defamatory* statements can sometimes serve as the basis for an IIED claim, *see Carter v. Hahn*, 821 A.2d 890, 894-95 (D.C. 2003), Mr. Blackwell does not allege that any relevant statement was made to a third party, as required to state a claim for defamation. *See Competitive Enterp. Inst. v. Mann*, 150 A.3d 1213, 1250 (D.C. 2016) (noting that one of the elements of defamation is publication of the statement to a third party); *cf. Robertson*, 269 A.3d at 1033 (holding that an employer's published "statement that appellant failed to demonstrate satisfactory performance" in a job "was neither extreme nor outrageous"). And finally, Mr. Blackwell alleges four total incidents in which he claims he was treated with hostile disrespect—two in person and two over the phone, occurring over the course of several months and involving several different employees. To the extent this is a

pattern of conduct, we do not view it as "go[ing] beyond all possible bounds of decency," such that it should "be regarded as atrocious[ ] and utterly intolerable in a civilized community." *Robertson*, 269 A.3d at 1033 (citation modified); *cf. Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1030, 1037 (D.C. 2015) (concluding that a school psychiatrist's romantic and sexual relationship with a student's mother over the course of several months did not rise to the level of "extreme and outrageous" behavior).

Cognizant of the "demanding" standard we apply in this area of the law, we conclude that Mr. Blackwell has failed to plausibly allege that he was subjected to any "extreme and outrageous" conduct and, therefore, has failed to state a claim for IIED. *See Robertson*, 269 A.3d at 1033.[2]

### C. Negligent Infliction of Emotional Distress

A plaintiff like Mr. Blackwell, who does not allege that he is within the "zone of physical danger" for a negligent act causing harm, may recover for negligent infliction of emotional distress if he shows that "(1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that

---

[2] In addition, as we explain below in Part II.C., Mr. Blackwell has not plausibly alleged that Planet Fitness's guarantee of a "Judgement Free Zone" imposed a heightened duty of care on the defendants to protect his emotional well-being.

necessarily implicates the plaintiff's emotional well-being"; "(2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff;" and "(3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810-11 (D.C. 2011).

In *Hedgepeth*, our seminal case defining the scope of NIED liability where there is no "zone of physical danger," we noted that "not all relationships will give rise to a duty to avoid negligent infliction of emotional distress." *Id.* at 812 n.39. Rather, an actionable special relationship is one where "emotional well-being of others is at the core of, or is necessarily implicated by, the undertaking." *Id.* at 814. Examples include the relationship between a psychiatrist and a patient and the relationship between a funeral home and the immediate family of the deceased person whose body has been placed in the funeral home's care. *See id.* at 813-14. By contrast, we have held, for example, that "the relationship between a student and his school or the musical director of his choir program" does not, on its own, impose this heightened duty of care. *Sibley v. St. Albans Sch.*, 134 A.3d 789, 798 (D.C. 2016); *see also Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1269 (D.C. 2015) (noting that "courts have been reluctant to impose a duty to avoid negligent infliction of emotional distress to clients even upon the attorneys who represent them"); *Hedgepeth*, 22 A.3d at 814 (explaining that "the duty of a podiatrist who is engaged

to treat a patient for an ingrown nail . . . [is] not concerned with the emotional well-being of the patient").

Relying on quoted passages from a Planet Fitness webpage, Mr. Blackwell alleges that Planet Fitness holds itself out as a "Judgement Free Zone" and promises "to provide a unique environment in which anyone . . . can be comfortable [and] . . . where a lasting, active lifestyle can be built." Mr. Blackwell suggests that the defendants had a relationship with him that "necessarily implicates his emotional well-being," *Hedgepeth*, 22 A.3d at 810, because Planet Fitness "offers its facility to improve the health and wellness of its members and the community at large." Implicitly comparing his relationship with Planet Fitness to the relationship between a patient and their doctor, he further urges that Planet Fitness undertook a comparable duty to safeguard his emotional health because "care for the body and the emotions are so interlinked."

We explained in *Hedgepeth* that our "principle" of NIED liability "based on the nature of the defendant's relationship with, or undertaking to, the plaintiff" is "self-limiting." *Id.* at 812. The allegations in Mr. Blackwell's amended complaint illustrate this point. Viewing the pleadings in Mr. Blackwell's favor, we infer that Planet Fitness's choice to market itself as a "Judgement Free Zone" indicates its intent to provide a kind, welcoming, and wellness-focused environment to its

customers. Planet Fitness may also have owed Mr. Blackwell, as a business invitee, "a duty to protect customers from foreseeable dangers" while he used the facility. *Bruno v. W. Union Fin. Servs., Inc.*, 973 A.2d 713, 718 n.5 (D.C. 2009) (citing *Viands v. Safeway Stores, Inc.*, 107 A.2d 118, 121 (D.C. 1954)).

But Planet Fitness's marketing choices, as alleged in the amended complaint, do not transform the basic duty of care that it owes to customers into an expansive responsibility to protect them from emotional harm. As we suggested in *Hedgepeth*, the "duty of care owed by [a] business invitor to invitee" does "not . . . necessarily implicate the emotional well-being of the parties." 22 A.3d at 812 n.39. And we have cautioned, in other contexts, that open-ended advertising guarantees like this one do not impose an "unconditional and unlimited" duty of performance on the advertiser. *Pearson v. Chung*, 961 A.2d 1067, 1075-76 (D.C. 2008) (holding that a reasonable customer would not interpret a dry cleaner's advertisement stating "Satisfaction Guaranteed" as an "unconditional and unlimited warranty of satisfaction to the customer as determined solely by the customer"); *see Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 667 (D.C. 2024) (distinguishing *Pearson* but explaining that "if Pearson's claim depended entirely on reading 'Satisfaction Guaranteed' to mean any customer demand must be satisfied[,] that would be absurd" and "unreasonable"). Put differently, even accepting that Planet Fitness's promises about its supportive customer environment are an "inducement to membership," as Mr.

Blackwell alleges, they cannot reasonably be interpreted as a promise that Planet Fitness will treat each customer the way a doctor must treat each patient. *Cf. Doe*, 116 A.3d at 1269; *Sibley*, 134 A.3d at 798. Drawing from our "reservoir of knowledge of societal norms," *Hedgepeth*, 22 A.3d at 814, we conclude that the relationship as pled in the amended complaint between Mr. Blackwell as a customer, and Planet Fitness as the operator of a business that offers exercise facilities to the public, is not the kind of relationship that can give rise to NIED liability. *See id.* at 810-11. Because Mr. Blackwell has not plausibly alleged that Planet Fitness's promise of a "Judgement Free Zone" created the kind of relationship that "necessarily implicate[d]" his "emotional well-being," *Hedgepeth*, 22 A.3d at 815, he fails to state a claim for negligent infliction of emotional distress.

### D.     Negligent Hiring, Training, and Supervision

"In an action against an employer for negligent supervision, liability is 'predicated upon the employer's direct negligence, rather than under a theory of vicarious liability based on the employee's negligence.'" *Blair v. District of Columbia*, 190 A.3d 212, 229 (D.C. 2018) (quoting *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937 (D.C. 2002)). To state a claim for negligent supervision, a plaintiff must "show: [(1)] that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and [(2)] that

the employer, armed with that actual or constructive knowledge[,] failed to adequately supervise the employee." *Katz v. District of Columbia*, 285 A.3d 1289, 1317 (D.C. 2022) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)).

As discussed above, Mr. Blackwell has failed to state a claim for assault, NIED, or IIED based on the behavior of Planet Fitness employees, so those torts cannot be a basis for his negligent supervision claim. *See Newmyer*, 128 A.3d at 1038 (explaining that the appellant's "negligent supervision claim against Sidwell fails" because his underlying "claims against Dr. Huntington" failed). Mr. Blackwell does not otherwise explain how the employees' actions identified in the amended complaint—the "you don't know who I am" incident on October 26, 2023; the intimidating stare and summoning of the police on October 27, 2023; and the two phone calls on January 4 and 5, 2024—constituted "dangerous or . . . incompetent" conduct. *Katz*, 285 A.3d at 1317; *see Daka, Inc. v. McCrae*, 839 A.2d 682, 693 & n.12 (D.C. 2003) (noting that the appellant was "most probably right" that "negligent supervision, while an independent tort directed to the conduct of the employer, requires logically antecedent proof of a tort committed by the supervised employee," and citing cases supporting that proposition). Therefore, Mr. Blackwell fails to state a claim for negligent supervision. *See Newmyer*, 128 A.3d at 1038; *Katz*, 285 A.3d at 1317; *Daka, Inc.*, 839 A.2d at 693.

## E.     Breach of Contract

"A party asserting breach of contract must prove four elements: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *CorpCar Servs. Hou., Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1244-45 (D.C. 2024) (citation modified). "A third party to a contract may sue to enforce its provisions if," and only if, "the contracting parties *intend* the third party to benefit directly thereunder." *Hossain v. JMU Props., LLC*, 147 A.3d 816, 820 (D.C. 2016) (emphasis in original) (citation modified). A person need not be named in a contract in order to be a third-party beneficiary, but the contracting parties' express or implied intent to benefit that person must be "ascertainable from the contract and the circumstances of the contract." *Id.* (citation modified).

The amended complaint alleges that "PF Black Card[ ] members receive additional benefits, including the ability to bring a guest for free and access to any [Planet Fitness location]." A Black Card member, according to the amended complaint, can "bring [their] friend (and their ID!) to the front desk and sign in," after which "the [g]uest is able to use the facility . . . while the Black Card member is also present at the facility." Mr. Blackwell alleges that he registered as a guest in February 2023 and was given a PF Keytag that he used regularly for nearly eight

months. He alleges that "Defendants' refusal to allow Plaintiff to enter and use [their] facility on October 26 and October 27, 2023, breached [their] agreement made upon issuance of the PF KEYTAG to Plaintiff, which allowed Plaintiff to use the facility when the Black Card Member[ ] is also present." He further contends that "Defendants' employee['s] threat and actions to Bar[ ] Plaintiff from using [their] facility breached the Defendants' agreement to permit Plaintiff's use of the facility when the Black Card Member[ ] is also at the facility." Relying on these allegations, Mr. Blackwell contends that he is an intended third-party beneficiary of the contract between Planet Fitness and the Black Card member because a provision in the Black Card membership agreement allows a Black Card member to bring one guest who may access the facility while the Black Card member is present.[3]

But Mr. Blackwell does not allege that the contracting parties—the unnamed Black Card member and Planet Fitness—had Mr. Blackwell in mind, specifically,

---

[3] In the amended complaint, Mr. Blackwell appears to allege that Planet Fitness's choice to hold itself out as a "'Judgement Free Zone' without intimidation, harassment or threats by its employees" created an independent contract with him as a user of their facilities. But the trial court dismissed Mr. Blackwell's breach of contract claim on the ground that he did not adequately plead that he was an intended third-party beneficiary of the membership contract between the Black Card member and Planet Fitness, and on appeal, Mr. Blackwell proceeds only on the intended-third-party-beneficiary theory. Accordingly, we decline to address this argument. *See Tuckson v. United States*, 77 A.3d 357, 366 (D.C. 2013) ("It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived.") (citation modified).

when they entered into the membership agreement. The amended complaint does not include a copy of the relevant contract, and the portions quoted in the amended complaint refer to the "guest keycard" capability as a benefit conferred on the Black Card member rather than on the guest. Nothing in the amended complaint indicates that the underlying Black Card member contract contained any reference to Mr. Blackwell, and he likewise does not allege any circumstances outside the four corners of the contract evincing the parties' mutual intent to benefit Mr. Blackwell. *Cf. Silberberg v. Becker*, 191 A.3d 324, 334 (D.C. 2018) (holding that the appellants were third-party beneficiaries to the contract where they "signed the minutes of the special meeting at which the directors resolved to enter into the" contract, even though they were not expressly mentioned in the contract). At most, he has alleged that he is a member of "a class of persons designed to benefit from a contract," because the Black Card membership program allows a Black Card member to bring another member of the public as a guest. *May*, 322 A.3d at 573. But this would make him an "incidental beneficiar[y]" to the Black Card member's contract, and "only an *intended* beneficiary can sue to enforce a contract existing 'between two others.'" *Hossain*, 147 A.3d at 820 (quoting *District of Columbia v. Campbell*, 580 A.2d 1295, 1302 (D.C. 1990)) (emphasis added). Because Mr. Blackwell has not plausibly alleged that he was a party to, or a third-party beneficiary of, a contract, he fails to state a claim for breach of contract. *See id.*; *May*, 322 A.3d at 573.

### III.  Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

*So ordered*.